IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

AUGUST 1997 SESSION

FILED

September 15, 1998

Cecil Crowson, Jr.

Appellate Court Clerk

| | | |
|---|---|---|
| DAVID ALLEN BRIMMER, | * | C.C.A. # 03C01-9703-CC-00083 |
| Appellant, | * | ANDERSON COUNTY |
| VS. | * | Hon. James B. Scott, Judge |
| STATE OF TENNESSEE, | * | (Post-Conviction--Death Penalty) |
| Appellee. | * | |

For Appellant:

W. Thomas Dillard
Ritchie, Fels & Dillard, P.C.
606 West Main Street
Suite 300, P.O. Box 1126
Knoxville, TN 37901-1126

For Appellee:

John Knox Walkup
Attorney General and Reporter

Michael E. Moore
Solicitor General

Darian B. Taylor
Assistant Attorney General
Criminal Justice Division
Cordell Hull Building, Second Floor
4025 Fifth Avenue North
Nashville, TN 37243-0493

Jan Hicks
Assistant District Attorney General
Room 126, Anderson County Courthouse
Clinton, TN 37716

OPINION FILED:_____

AFFIRMED IN PART; REVERSED AND REMANDED IN PART

GARY R. WADE, JUDGE

The petitioner, David Allen Brimmer, was convicted of first degree murder on March 1, 1991. A jury imposed the death penalty based upon a single aggravating circumstance: that the petitioner was engaged in the commission of a robbery at the time of the crime. Tenn. Code Ann. § 39-13-204(i)(7). On direct appeal, the conviction and sentence were affirmed by our supreme court. State v. Brimmer, 876 S.W.2d 75 (Tenn. 1994). On April 18, 1995, the petitioner filed a post-conviction petition alleging, among other things, that he was denied the effective assistance of counsel. At the conclusion of the evidentiary hearing, the trial court denied relief.

In this appeal of right, the petitioner presents the following issues for our review:

(I)     whether the petitioner was denied the effective assistance of counsel;

(II)    whether the petitioner's confession should have been excluded from the evidence;

(III)   whether there was prosecutorial misconduct during the course of the trial; and

(IV)    whether various constitutional violations and trial errors entitle the petitioner to relief from his death sentence.

We affirm the denial of post-conviction relief on the conviction of first degree murder. Due to the ineffective assistance of defense counsel in the sentencing phase of the trial, we reverse the penalty of death and remand to the trial court for a new hearing.

On the evening of October 22, 1989, the victim, Rodney Compton,

2

was to have returned to the Knoxville airport from a cruise to the Bahamas. Sixteen days later, his body was discovered in a hayfield in rural Loudon County. An autopsy established that his neck had been cut. Suffocation and strangulation were the probable causes of death.

On February 3, 1990, the petitioner was arrested on unrelated charges in Refugio, Texas. It was determined that he was driving the victim's pickup truck. The victim's jacket and a pair of handcuffs were inside the vehicle. Three weeks later, the petitioner confessed that he had killed the victim. He told officers that on the evening of October 22, the victim had offered him a ride in his truck. While conceding that he had intended to rob the victim, the petitioner claimed that when the victim made sexual advances, he represented to the victim that he was a police officer and then "arrested" and handcuffed the victim. The petitioner revealed that he then drove the victim to a location in Anderson County, choked him to death, and returned to Loudon County where he disposed of the body. While being returned to this state from Texas, the petitioner informed officers that he had killed the victim in a park in Anderson County. Another source indicated that the petitioner had been in Anderson County at the time of the victim's disappearance. Other evidence established that only a few days after the disappearance of the victim, the petitioner was seen in possession of the victim's truck, his jacket, and several of the souvenirs that had been purchased in the Bahamas. See Brimmer, 876 S.W.2d at 78.

During the course of trial, the petitioner was initially represented only by Attorney Thomas DePersio. When the petitioner complained to the trial court about his lack of communication from DePersio, Michael Clement was appointed. Clement, who had three years' experience in the law practice, had not been previously involved in a capital case. He recalled that he had not utilized an expert

3

in any prior criminal case, although he "may have [used one] in a personal injury matter." Clement, who had completed only three jury trials before this case, was appointed as additional counsel approximately two months prior to trial.[1] An investigator, Mike Cohan, was employed to assist the petitioner and his attorneys some five weeks prior to trial.

During the course of the evidentiary hearing on this post-conviction claim, Clement testified that soon after his appointment, he became the first of petitioner's attorneys to review the state's evidence. DePersio had not previously done so. Clement recalled meeting with DePersio on several occasions prior to trial. He also remembered that DePersio often drank beer during their meetings, some of which started as early as 9:00 A.M. Clement, a solo practitioner, described DePersio as having a heavy caseload as a public defender. Clement perceived DePersio as having a substance abuse problem and remembered that DePersio went to a bar at the conclusion of the penalty phase of the trial while the jury engaged in its deliberations. DePersio was not present when the jury sentenced Brimmer to death. Clement conceded that he made no complaints to either the public defender or the Board of Professional Responsibility about DePersio's conduct.

Prior to the trial, Clement had expressed concern to DePersio about the petitioner's mental condition and suggested an evaluation. DePersio expressed his belief that psychological proof was "voodoo" and "did not work." He also thought it was not particularly relevant in this case because the petitioner had denied

---

[1]Tennessee Supreme Court Rule 13 governs appointment of counsel in capital cases. Prior to July 1, 1997, the rule provided, "[i]n a capital case two attorneys may be appointed for one defendant." Tenn. Sup. Ct. R. 13, § 1 (prior to amendment in 1997) (emphasis added). Effective July 1, 1997, the rule provides that "at least two attorneys must be appointed to represent a defendant at trial in a capital case." Tenn. Sup. Ct. R. 13, § 3 (b).

committing the crime. DePersio did, however, consent to a psychological evaluation of the petitioner, which was later performed by Dr. Eric Engum. DePersio had no objections to the psychological proof as long as Clement "had to find the person, [] do the research, [and] prepare.... It was [Clement's] issue."

Clement recalled that the hearing on the defense motion to suppress the confession filed by DePersio was held long before his appointment to the case. At the suppression hearing, DePersio did not raise any psychological issues concerning the voluntariness or accuracy of the confession. Clement recalled asking DePersio "why ... didn't he raise any psychological issues at the suppression level."

Clement also recalled that he and Dr. Engum had done research on the possibility of Prisoner of War Syndrome, based upon the twenty-one days the petitioner served in solitary confinement prior to his confession in Texas. He questioned DePersio's decision not to use Dr. Engum during the suppression hearing. It was Clement's opinion that Dr. Engum would have been helpful in establishing how Brimmer "could have been broken and given a confession."

Clement testified that when two attorneys represented a party defendant, it was customary in the Anderson County trial court for the specific attorney who conducted the cross-examination of a state witness to also take full responsibility for making objections to any inappropriate questions by the state. He remembered that DePersio, who cross-examined the Refugio County Sheriff, failed to object to a statement during trial that the petitioner had "killed before." Clement could not recall why he himself had not done so, but insisted his failure to object was "unforgivable." He also could not think of any reason why there was no motion

5

for a mistrial or why the issue was not raised in the motion for a new trial. He remembered, however, that DePersio had been effective in cross-examining some of the state witnesses, creating inconsistencies among those present on the "killed before" allegation. Clement claimed DePersio did not get involved with the psychological components of the case because DePersio had insisted that "Dr. Engum was [in his] bailiwick." Clement conceded that the trial court refused to grant a request by the defense for instructions on the subject of mitigating circumstances at the conclusion of the penalty phase of the proceeding.

Clement testified that he had given his best effort on behalf of the petitioner, although much of his time investment had been after his regular business hours. He utilized the discovery procedure soon after his appointment, had no difficulty in communicating with the petitioner, and had access to a forensic team's evaluation of the petitioner which showed the petitioner was competent to stand trial and sane when he committed the offense.

The defense theory was that the petitioner did not commit the crime. Clement testified that there had been no attempt to establish an insanity defense. He explained that such a defense would have essentially required an acknowledgment that the petitioner committed the murder, but that it was due to a mental disease or defect. Clement recalled that the defense had been successful in its effort to bar any reference to the specific details of the prior killing in Massachusetts. The state had been ordered not to make any reference to the occurrence.

Clement recalled that he felt the defense had been "gutted" during the guilt phase when the trial court refused to allow Dr. Engum to testify. The defense

6

strategy included a representation to the jury that Dr. Engum would appear on behalf of the petitioner.[2] Dr. Engum would testify that the confession was the result of the Prisoner of War Syndrome. Clement "had no idea that Dr. Engum's testimony was going to be disallowed during the guilt phase." The theory at trial was to "show the jury that these people in Texas treated [Brimmer] like a prisoner of war and he ... became a babbling idiot and said anything they wanted [him] to say. But that [evidence] was disallowed by Judge Scott."

At trial, there were general instructions to the jury on mitigating circumstances. The defense was allowed to argue that the petitioner was afflicted with Borderline Personality Syndrome and Abandoned Child Syndrome.

At the evidentiary hearing, Dr. Eric Engum testified that at the time of his examination, he had records and letters from the Devereux Foundation, the John Byrne Center, the Ridgeview Psychiatric Hospital, and the Middle Tennessee Mental Health Institute concerning the petitioner. He concluded that the petitioner was competent to stand trial and that an insanity defense could not be supported. He recalled that he had informed defense counsel in early January, at least six weeks before the trial, that there was some evidence of mitigation. Dr. Engum had no further contact with trial counsel until the date the trial began. He acknowledged, however, that he conferred with defense counsel on a daily basis thereafter as to the voluntariness of the confession. He recalled that defense counsel first talked to him about mitigation evidence "an hour or so" before the penalty phase began. Dr. Engum acknowledged that defense counsel never specifically asked about the statutory mitigating circumstances, something which was typically done in his prior

---

[2]See State v. Zimmerman, 823 S.W.2d 220, 221-22 (Tenn. Crim. App. 1991) (counsel found ineffective for promising the jury during opening statement that a psychiatrist would attest to the defendant's "battered wife syndrome" and then failing to call the witness).

experience with capital cases. There was some mitigation evidence. Dr. Engum did testify about his diagnosis of borderline personality disorder and specifically recalled commenting about the possibilities associated with Abandoned Child Syndrome and Burned Child Syndrome.

Dr. Ann Marie Charvat, a clinical sociologist, also testified at the evidentiary hearing. Having been employed in approximately fifty capital cases, she did not participate in the trial but, sometime afterward, had prepared a social history assessment of the petitioner at the request of post-conviction counsel. While acknowledging that she had not advertised the availability of her services prior to the trial, Ms. Charvat assessed what, in her view, should have been done for the petitioner on the subject of mitigation. Dr. Charvat prepared a report, called a "mitigation time line," which was entered into evidence without objection from the state. Dr. Charvat described the time line as "the outline that I would have followed if I had done the investigation."

Dr. Charvat testified that she usually goes through various steps in preparing mitigation for trial: (1) interviewing the defendant and attorneys; (2) obtaining documentation of the individual's life beginning with birth records; (3) interviewing witnesses she discovers from the documents; (4) interviewing significant family members; and (5) clarifying mitigation factors for presentation to the jury. In the petitioner's case, however, she only interviewed the attorneys from the petitioner's trial, reviewed the materials provided by the attorneys and collected a "substantial amount of documentation that included some school records [and] some of his early intervention records." She also interviewed the petitioner extensively. Other than petitioner's attorneys and the petitioner himself, Dr. Charvat did not interview any other witnesses. On cross-examination, Dr. Charvat conceded

8

that she had no way of knowing if any of the witnesses uncovered in her investigation would actually testify in court.

The mitigation time line report shows the petitioner's mother had a "serious drinking problem" and neglected, malnourished, and abused the petitioner and his siblings. When the petitioner was three years old, he was placed in foster care and separated from his siblings. When he was seven, he was placed in the Hansen foster home and subjected to severely "ritualized" physical abuse while in their custody. He was also forced to live in the basement while the Hansen's biological children lived in the main area of the house. The Hansen's natural children were not abused.

At age thirteen, the petitioner was placed in Devereux Foundation, a home for mentally disturbed children. At the initial evaluation, the petitioner reported having numerous nightmares while living with his foster parents. The psychiatric evaluation conducted by Devereux Foundation showed the petitioner suffered Abandoned Child Syndrome and depression. The report indicated he also tended to reject interpersonal relationships in order to avoid rejection. Devereux Foundation reported the petitioner AWOL on occasion. He also ran away from his foster placements on various occasions.

The petitioner left Devereux Foundation after graduating from high school and lived as a drifter for several years. In 1982, at twenty years of age, he met Mary Barber, who would become the mother of his two sons. He lived with her sporadically. He was in and out of various hospitals for mental problems but never remained in one hospital long enough to get any type of qualitative treatment. Northwest Texas Hospital, where he stayed for less than one month, diagnosed him

9

with "atypical psychosis." A second stay at Northwest Texas Hospital resulted in a determination that the petitioner suffered "no real signs of deficit or psychosis." A third diagnosis by Northwest Texas Hospital was that the petitioner had factitious disorder and anti-social personality disorder.

The mitigation time line also showed the petitioner had several brushes with the law for theft offenses, burglary, disorderly conduct and malicious mischief.

Attorney Tom DePersio, who had practiced law for eighteen years and also had engaged exclusively in the criminal law as an assistant with the Public Defender's Office, had been involved in capital cases before that of the petitioner; in the prior instances, however, the cases had been resolved without an actual trial. He admitted that he had little contact with the petitioner during his representation and conceded that he had done "some, not much" of the investigation. An investigator from the Public Defender's Office was available to gather files and other information. DePersio acknowledged that there had been no effort to obtain Texas records or to contact officers from that state prior to the pretrial suppression hearing on the admissibility of the confession. He recalled filing a motion for services but then not following through on the request. He also admitted that he had not sought a psychological evaluation of the petitioner to assist in the suppression hearing.

DePersio, who admitted that he was abusing alcohol and cocaine at the time of the trial, conceded that his abuse adversely affected his ability to give full attention to matters relating to the petitioner at that time. He recalled that he had filed an affidavit to that effect in the direct appeal. The Rule 12 report form of the trial judge made no mention of any inadequacies in his representation. See Tenn.

10

Sup. Ct. Rule 12(D).[3]

DePersio recalled that the petitioner had filed a pro se "Motion to Elect Counsel" on December 12, 1990. The petitioner alleged that he had not seen his attorney since May, 1990. At the motion hearing, the petitioner testified that he was not otherwise dissatisfied with his attorney and said, "[i]f I can just get to, you know, talk to them once in a while and know what's going on." After the hearing, Clement was appointed to assist in the representation of the petitioner.

DePersio claimed that the confession had been coerced. He specifically recalled a vigorous attack on the credibility of the sheriff during cross-examination. He acknowledged that he had not objected to the sheriff's reference to the petitioner's comment that he had "killed before" because the reference, in context, was not particularly damaging and to object would have emphasized the point to the detriment of the petitioner. DePersio's cross-examination also established that none of the other officers present during the interrogation had heard the petitioner say "he had killed before."

In May of 1991, about two months after Brimmer's trial, DePersio was

---

[3]After reviewing the trial court's Rule 12 Report to the Supreme Court, Assistant District Attorney General Jan Hicks wrote the trial judge a letter which states in part:

> [T]here is one glaring omission under Part D10 "significant data about defense representation." ... Tom DePersio left after the question of penalty was submitted to the jury and did not return and was not present when the death penalty verdict was returned. This is, of course, a fact known to the Court .... While it may be a question as to whether this was "significant," it was certainly unusual, notable and well-publicized and since this is a death penalty case, we believe it should be noted in the report in all fairness to the defendant and the judicial process.

This letter is included in the record as an apparent effort to correct the Rule 12 Report.

placed on probation by the Board of Professional Responsibility. At that time, he also went through a four-month period of treatment for the substance abuse problem.

Ralph Harwell, who had practiced criminal law in the Knoxville area for twenty-seven years, examined certain of the trial records. He had been asked to determine whether defense counsel's performance "had measured up to an objective norm in the profession at that time" and "whether or not any errors that happened were so serious as to deprive the defendant of a fair trial." He was also asked to determine whether there was a reasonable probability that effective representation might have produced a different result. It was his opinion that the performance of defense counsel fell below the standards existing in 1991. Harwell pointed out that counsel should have had the petitioner examined by a psychiatrist or psychologist before the suppression hearing. He believed that counsel's failure to raise the unreasonableness of the petitioner's detention without a probable cause hearing in Texas fell below the minimum standards required in Tennessee and he faulted counsel for failing to object or seek a new trial based on the sheriff's testimony that the petitioner admitted "killing before." He testified that the failure to investigate until two months prior to trial, the failure to object to the trial court's refusal to instruct on applicable statutory mitigating circumstances, and the failure to include this issue in a motion for a new trial did not meet the minimum standards required of attorneys in this state.

On cross-examination, Harwell acknowledged that DePersio's affidavit concerning his substance abuse problem, while filed as an exhibit with the appellate brief, did not address his competence as counsel. He was aware that the supreme court did indirectly address the issue, ruling that the defendant's brief contained

"innuendo and incomplete citations" and misleading argument. Brimmer, 876 S.W.2d at 78.

Dr. Sam Craddock, a licensed psychologist employed by the Middle Tennessee Mental Health Institute, had testified in the sentencing phase of this trial. After conducting a seventy-one day evaluation of the petitioner, his forensic team had concluded that the petitioner was not mentally ill at the time of the offense and that there was no basis for an insanity defense. At the evidentiary hearing, Dr. Craddock recalled that the petitioner had not been "forthcoming" in supplying informational sources which might have assisted the team in its evaluation. A woman from Birmingham, Alabama, with whom the petitioner had resided for a time, was contacted and interviewed by the forensic team. While she was deemed credible, her comments about the petitioner were inconsistent with an insanity defense. Dr. Craddock conceded on cross-examination that his diagnosis might have been different had more information consistent with insanity been discovered. Dr. Craddock recalled that the petitioner made no claim about being diagnosed at a Virginia hospital in 1986 as suffering from atypical psychosis or other mental disease. When asked if he would have been able to determine a psychosis, if present, Dr. Craddock responded as follows:

> We suspected a psychosis, and anticipated seeing one, because he had been at Lakeshore [Mental Health Institute in Knoxville] before he was sent to forensic services. So we were watching carefully, and we saw some mild symptoms [that] gave us a suspicion of him being psychotic or schizophrenic. However, his behavior during our interviews wasn't particularly consistent with what he was like on the residential unit. And with the opportunity to have the seventy-one days, we ruled out that he was psychotic, while with us.

> * * *

> [O]ne of the tests that I gave was suggestive of symptom exaggeration, and it was primarily his ability to function well on the residential unit versus while he was during

13

clinical interviews.

Tom Marshall, the Public Defender for Anderson County, who had assigned DePersio to the case, testified that he had been involved in consultations from time to time during the preparations for trial and had no concerns about the quality of DePersio's performance. Marshall was aware of the petitioner's pretrial complaints about his lack of contact with DePersio and was aware of the formal hearing on the subject before the trial judge. He acknowledged receiving a few complaints that DePersio occasionally had alcohol on his breath but contended that he had investigated each complaint without finding corroborating evidence of impairment or "any qualitative problem with his representation." Marshall testified that he had represented the petitioner on direct appeal when DePersio resigned from his employment as assistant public defender. Marshall believed that DePersio and Clement were effective in their representation of the petitioner.

I

In this appeal, the petitioner first argues that he received the ineffective assistance of counsel. He complains about the following specific deficiencies:

> (a)  abuse of alcohol and illegal drugs during the period of representation;
>
> (b)  failure to provide regular consultation;
>
> (c)  failure to present psychological testimony at the suppression hearing;
>
> (d)  failure to perform an adequate investigation;
>
> (e)  failure to address comments that the petitioner had "killed before";
>
> (f)  failure to object to testimony about petitioner's comments made during transport from Texas to Tennessee;
>
> (g)  failure to prepare or present psychological

14

testimony in the sentencing phase;

(h)     failure to include all possible grounds for relief in the motion for new trial; and

(i)     failure to present as an issue the illegal detention of the petitioner.

In order to establish that his counsel was ineffective, the defendant must show that the advice given or services rendered were not within the range of competence of attorneys in criminal cases. Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975). He must also establish that but for his counsel's deficient performance, the results of the trial would have been different. Strickland v. Washington, 466 U.S. 668 (1984).

When defense counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing, there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." United States v. Cronic, 466 U.S. 648, 659 (1984). If there has been "an actual breakdown of the adversarial process," no prejudice need be shown. Id. at 658; Rickman v. Bell, 131 F.3d 1150 (6th Cir. 1997),[4] cert. denied, 118 S. Ct. 1827 (1998).

The burden is on the defendant to show that the evidence preponderates against the findings of the trial judge who, in this instance, found in favor of the state. State v. Zimmerman, 823 S.W.2d 220, 224 (Tenn. Crim. App. 1991); Clenny v. State, 576 S.W.2d 12 (Tenn. Crim. App. 1978). The findings in the trial court on questions of fact may not be reversed on appeal unless the evidence preponderates otherwise. Zimmerman, 823 S.W.2d at 224; Graves v.

---

[4]Except in Kentucky, when a prisoner voluntarily terminated his appeals, no death penalty has been carried out in the Sixth Circuit of the United States since the release of the Supreme Court's opinion in Gregg v. Georgia, 428 U.S. 153 (1976). Michigan has no death penalty. As of April 1, 1998, Ohio, Kentucky, and Tennessee have 305 prisoners on death row.

State, 512 S.W.2d 603 (Tenn. Crim. App. 1973).

In Strickland, the Court described the burden of proof as follows:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or ... sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.

To establish prejudice, the evidence stemming from failure to prepare a sound defense or present witnesses must be significant, but it does not necessarily follow that the trial should have otherwise resulted in an acquittal. See generally Nealy v. Cabana, 764 F.2d 1173, 1178-79 (5th Cir. 1985); Code v. Montgomery, 799 F.2d 1481, 1483 (11th Cir. 1986). There must be a reasonable probability that but for counsel's unprofessional error, "the result of the proceeding would have been different," not that it necessarily would have been different. Strickland, 466 U.S. at 693. The probable result need not be an acquittal. A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in Strickland. See Zimmerman, 823 S.W.2d at 225 (citing Chambers v. Armontrout, 907 F.2d 825, 832 (8th Cir. 1990)).

In Hellard v. State, 629 S.W.2d 4 (Tenn. 1982), our supreme court made the following pronouncements:

> Although ... we adopted a higher standard of competence for the legal representation required in criminal cases, we did not require perfect representation.

16

> Moreover, the defense attorney's representation, when questioned, is not to be measured by "20-20 hindsight."
>
> ***
>
> It cannot be said that incompetent representation has occurred merely because other lawyers, judging from hindsight, could have made a better choice of tactics.... [W]e know that a criminal trial is a very dramatic, vibrant and tense contest involving many variables and that counsel must make quick and difficult decisions respecting strategy and tactics which appear proper at the time but which, later, may appear to others, or even to the trial lawyer himself, to have been ill-considered.

Id. at 9-10. In Hellard, our supreme court adopted the rationale of United States v. DeCoster, 487 F.2d 1197, 1201 (D.C.Cir. 1973):

> This court does not sit to second guess strategic and tactical choices made by trial counsel. However, when counsel's choices are uninformed because of inadequate preparation, a defendant is denied the effective assistance of counsel.

Hellard, 629 S.W.2d at 9. Our supreme court has observed that "[c]ourts are particularly cautious in preserving the defendant's right to counsel at a capital sentencing hearing." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (internal quotation marks omitted). When, as here, there has been no complete breakdown of the adversarial process, the question becomes whether the defendant was prejudiced by these deficiencies:

> A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.

Strickland, 466 U.S. at 690.

17

(a)

The petitioner first argues that DePersio's "severe alcohol and cocaine abuse problems" prior to and during the trial prevented DePersio from providing the effective assistance of counsel. He argues that "Mr. DePersio's condition was, on its own, enough to severely prejudice [the petitioner's] defense."

The proof at the evidentiary hearing showed that DePersio regularly abused alcohol during the time he represented the petitioner. Attorney Clement testified that DePersio would arrive at early morning meetings with a six-pack of beer and that one or more of them would have already been consumed. Clement recalled that DePersio was at a bar during jury deliberations on the penalty. He believed DePersio to be "inebriated." DePersio acknowledged consuming "a lot of alcohol and cocaine" during this time.

In State v. Hamrick, 688 S.W.2d 477, 481 (Tenn. Crim. App. 1985), our court reviewed a claim of ineffective assistance where counsel suffered an "acute illness during the trial." At one point during trial, counsel had to be taken to the Loudon County Memorial Hospital. Id. The trial judge consulted with trial counsel and indicated that he would declare a mistrial if necessary. Counsel informed the trial judge he felt "good enough to continue." Id. On appeal, the defendant argued he was denied the effective assistance of counsel. Relying on Strickland's requirement of both deficiency in performance as well as a showing of prejudice, this court denied relief. Id. at 482. Both deficiency and prejudice must be shown. In this instance, the general condition of DePersio before or during the course of trial would not, standing alone, entitle the petitioner to relief.

18

There are few cases in this state in which a claim of ineffective assistance has been made due to counsel's intoxication. In State v. John C. Garrison, however, one of the claims of ineffective assistance of counsel was that counsel was absent from work and did not adequately prepare for trial "due to depression or excessive alcohol use." C.C.A No. 03C01-9702-CC-00047, slip op. at 25 (Tenn. Crim. App., at Knoxville, Feb. 27, 1998), app. filed, April 29, 1998. In Garrison, this court ruled that there must be a showing of prejudice before relief could be granted on the basis of alcohol abuse. Id.[5]

These rulings are consistent with the majority of jurisdictions. See Jeffrey L. Kirchmeier, Drink, Drugs, and Drowsiness: The Constitutional Right to Effective Assistance of Counsel and the Strickland Prejudice Requirement, 75 Neb. L. Rev. 425, 453 (1996). The federal courts have ruled that the abuse of drugs or alcohol is not "in and of itself, relevant to an ineffective assistance claim." Berry v. King, 765 F.2d 451, 454 (5th Cir. 1985). The Fifth Circuit has followed this reasoning even where the allegations supporting the ineffective assistance claim were that the defendant could smell alcohol on the attorney's breath during the trial and that, immediately afterward, the attorney entered a facility for treatment of alcohol abuse. Burnett v. Collins, 982 F.2d 922, 930 (5th Cir. 1993).

It is of particular concern that in a case of this magnitude, one of the two defense attorneys suffered from alcoholism or drug addiction. Professional standards demand much of the bench and the bar. Litigants expect and deserve sobriety among the officers of the courts. These circumstances reflect poorly on the criminal justice system. Yet alcohol or drug abuse by the defense attorney, without

---

[5]Garrison also challenged the performance of DePersio. The Court of Criminal Appeals found that use of excessive alcohol was not a basis for relief but did grant relief because of counsel's failure to communicate a plea offer to the defendant prior to trial. Garrison, slip op. at 25.

specific proof of its effect on performance, does not merit relief.

(b)

The petitioner's next complaint is that counsel failed to engage in regular consultation. Prior to trial, the petitioner filed a motion seeking new counsel. The petitioner complained that he had not seen his attorney in seven months, except for a few moments before the suppression hearing, which had been held some five months earlier. At the hearing, the petitioner described their meeting as follows:

> We didn't have any kind of conference. It was just, I came into the court room and came up here, did it, and then went back. No follow up and nothing beforehand-- before or after.

DePersio admitted that he did not consult with the petitioner. Clement's testimony corroborates the claim that DePersio did not engage in any meaningful conversations with the petitioner. Yet Clement testified that he himself had met with the petitioner on several occasions.

The trial court found as follows:

> (D) Failure to consult with the petitioner at all crucial stages of the proceedings. At the [post-conviction] hearing, the petitioner chose not to testify.... There is some evidence petitioner sought new counsel pretrial ... but the record reflects that the petitioner abandoned his motion.... No [other] evidence was presented that the petitioner's other attorney failed to adequately communicate with him. The court concludes that the petitioner has failed to meet his burden of proof regarding this allegation.

In Baxter v. Rose, our supreme court emphasized the importance of consultation between the attorney and client. 523 S.W.2d at 934. The purposes are to "elicit matters of defense" and apprise the accused of "potential strategies and tactical choices." Id. at 933.

20

Clearly, DePersio failed to achieve the minimum standards in the area of client consultation. On the other hand, Attorney Clement, who was appointed about two months before the trial, did regularly confer with the petitioner on matters pertinent to his defense. His effort is worthy of mention. The question is whether the petitioner has shown by a preponderance of the evidence that DePersio's failure to meaningfully communicate with him from May of 1990 through November of 1990 affected the outcome of the trial.

The short answer is no. There are few indications in the record that DePersio would have changed the trial strategy had he conferred more regularly with Brimmer during this period of time. Because the petitioner has failed to satisfactorily prove how this lack of communication might have affected the results of the trial, no relief can be granted on this basis. In this regard, the evidence does not preponderate against the findings of the trial court.

(c)

The petitioner also argues that his attorneys were ineffective for failing to present psychological testimony at the suppression hearing. He contends that psychological testimony should have been used to "show that [he] was especially susceptible due to mental and emotional disorders and may have told the authorities whatever they wished to hear." He submits that his trial counsel failed to consider the use of psychological evidence until several months after the suppression hearing and points out that Dr. Engum had not been asked to render an opinion on the confession until the trial began.

At trial, defense counsel sought to introduce Dr. Engum's testimony to show that the petitioner may have given a false confession due to "Prisoner of War

21

Syndrome." The state objected and the trial court conducted an extensive jury out hearing during which Dr. Engum testified that sensory deprivation occurring in solitary confinement might result in a false statement by the prisoner in order to please his captors. Dr. Engum testified that the petitioner was susceptible to giving a false confession. The trial court excluded the evidence as unreliable but also observed that this psychological testimony "would have been vitally important for the record at the time I made my decision [at the suppression hearing]."

In the original appeal, the petitioner argued that the trial judge's ruling amounted to a violation of his right to present a defense. Brimmer, 876 S.W.2d at 79. Our supreme court, however, ruled that the trial court did not abuse his discretion by disallowing the testimony. Id. In consequence, that issue may not be revisited by this court.

At the post-conviction hearing, the trial judge made the following findings as to this claim:

> (A) Failure to adequately investigate all pretrial motions, including motions for investigative services and motions relating to the suppression of his confessions while in custody in Texas. Trial counsel investigated and fully litigated all Fifth and Sixth Amendment claims relating to the petitioner's confessions in Texas. The issue was determined to be without merit in the trial court and on direct appeal. The petitioner has failed to meet his burden of proof with respect to any other possible claims relating to the suppression of his confessions.

In our view, the petitioner has shown no prejudice by the failure to present psychological evidence at the suppression hearing. Whenever the claim of ineffective assistance is based on the failure to submit proof, there must be a showing of what the evidence would have been. State v. Davis, 912 S.W.2d 689, 698 (Tenn. 1995). In the absence of that, there can be no speculation as to what

22

the psychological evidence "would have shown and ... how it would have benefitted" the petitioner. Id. No such evidence appears in this record.

Moreover, even if the testimony of Dr. Engum had been presented at the suppression hearing, the confession would not have been excluded. In Colorado v. Connelly, 479 U.S. 157, 164 (1986), the United States Supreme Court ruled that "a defendant's mental condition, by itself and apart from its relation to official coercion" does not render a statement involuntary. Because the rule of exclusion has been established as a deterrent to police misconduct, coercive activity on the part of law enforcement is a necessary predicate to finding that a confession is not voluntary under the Due Process Clause. Id. at 165.

(d)

The petitioner also makes the general claim that his trial counsel failed to perform an adequate investigation. Assistant District Attorney Jan Hicks filed a sworn statement that she advised DePersio of her office's open file policy in May of 1990. She stated that DePersio never "avail[ed] himself of this offer." No discovery was conducted until Clement was appointed co-counsel seven months later. Clement testified that Ron Johnson, an attorney with the public defender's office, had conducted some investigation. Also, the trial court appointed an investigator, Mike Cohan, to assist in the preparation of the defense.

In Baxter v. Rose, 523 S.W.2d at 932, our supreme court set forth the following standards on investigation:

> Counsel must conduct appropriate investigations, both
> factual and legal, to determine what matters of defense
> can be developed. The Supreme Court has noted that
> the adversary system requires that all available defenses
> are raised so that the government is put to its proof. This
> means that in most cases a defense attorney, or his

23

agent, should interview not only his own witnesses but also those that the government intends to call, when they are accessible. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. And, of course, the duty to investigate also requires adequate legal research.

The preparation of the defense was delayed by the inaction of DePersio. Professional standards require a more timely effort. Yet there has been no proof offered as to what more trial counsel would have discovered had he begun the investigation earlier. Thus, we agree with the assessment of the trial judge that the petitioner has failed to establish prejudice.

(e)

The petitioner also complains that his trial counsel was ineffective for failing to object to testimony at trial that he had "killed before." The state argues that counsel properly wanted to avoid any emphasis on the statement in the presence of the jury.

Sheriff Jim Hodges, of Refugio County, Texas, testified during direct examination as to the circumstances surrounding petitioner's written confession:

> We talked to him, and he said that he did kill this Mr. Compton and that the reason – I had told him that I felt like he had killed before and that was the reason he was holding back, because he didn't want to tell about everything. And so he said, yeah, you're right. I have killed before, and I did kill Mr. Compton.

The reference does not appear to have been solicited by the state and no objection was made to this testimony.

On re-direct examination at trial, the following exchange occurred:

Prosecutor: How far did you actually get into the

24

interview, when you all first set down for the interview, before he started crying?

Sheriff Hodges: Probably right after he came back with the jailer and sat down and we started talking to him and he started answering questions; and the more we got into it, you know, it was catching up with him and, like I say, he was just unloading and he had this burden that was bothering him a lot about this murder and some others.

On re-cross, the following exchange occurred:

DePersio: Now then, from the time that he began to talk after the jailer brought him back, was Moldenhauer and Hernandez present?

Sheriff Hodges: Yes, sir.

DePersio: So if he had said, I've killed before, they would have heard that; is that correct?

Sheriff Hodges: I would think so.  I'm not sure.

In the very last paragraph of closing argument at the guilt phase, the state made the following argument:

> There is ... what one <u>would</u> call the Soddi defense, S-O-D-D-I.  Some other dude did it.  Who?  It's not there. It's easy though to fantasize.  One could fantasize anything.  One could fantasize Martians coming down and doing it.  But that's not what the proof in this case is. I trust you to use your common sense. ...
> Mr. DePersio said something to you and I have the right to respond, to make a fair response to something that he said.  And what he said to you and I quote, "Nothing in his background to suggest he is a killer."  Recall what the sheriff said to him when he was alone with him. <u>He said, son, you've killed before.</u>  And that's truth, members of the jury, not speculation.

(Emphasis added).

At the post-conviction hearing, DePersio testified that he had filed a motion in limine to limit reference to any prior crimes.  He recalled that his usual practice in this type of situation, where a state witness has not complied with a

25

pretrial order limiting testimony, is to address the matter outside the jury's presence during a recess. DePersio acknowledged he did not do that in this case. He testified, however, that he did not make a contemporaneous objection because he did not want to draw further attention to it. Clement characterized his own failure to object as unforgivable.

On direct appeal, the petitioner argued that the admission of this testimony denied him his right to due process. Brimmer, 876 S.W.2d at 80. Our supreme court ruled as follows:

> Our investigation of these complaints indicates initially that the issue was waived. There was no contemporaneous objection when any of these allegedly objectionable remarks were made. Defendant did not request the Court to instruct the jury to disregard comments about other killings. ... Moreover, this issue was not raised on the motion for new trial. Certainly it would have been better if none of the remarks had been made .... Under the circumstances and evidence in this case we do not think these incidents constitute reversible error.

Id. (emphasis added).

In the order denying post-conviction relief, the trial judge made the following findings and conclusions:

> (I) Failure to enforce pretrial rulings regarding the admission of evidence that the petitioner had killed before. This issue has been previously determined on direct appeal [and it has been determined that the] petitioner suffered no prejudice from this evidence. [Counsel was not ineffective in this regard.]

Clearly, the supreme court considered the merits of the petitioner's claim that the "killed before" reference qualified as error. The ruling was that the evidence should not have been permitted but was nonetheless not reversible in the context of the entire trial. While the issue has been raised here in a context of

26

ineffective assistance of counsel, the supreme court held that if there was error by the failure to exclude the reference, no prejudice resulted. That conclusion by the supreme court controls. Even if counsel was deficient for having failed to further object to the reference made by the witness, our supreme court has already determined that the deficiency had no effect on the results of the trial.

(f)

The petitioner also complains that his attorney was ineffective for failing to object to the introduction of statements he made while being transported from Texas to Tennessee. Detective Richard Foschino testified at trial that he and Captain Bob Higgs of the Anderson County Sheriff's Department returned the petitioner to this state. Detective Foschino testified that the petitioner discussed the homicide "freely":

> The way the conversation started out about the homicide itself was, we were talking about–David had been talking about his past and about how he had been a victim of abuse when he was a child. He started talking about victims that Mr. Compton may have had in the past. And when I started talking to him about that, he started clarifying it, saying that when he met with Mr. Compton on the road and they went into the park area, that Mr. Compton had said something about he could get some children for David. And David became very upset with him at the time. And he was referring to sexual activity with these children. And David talked quite a bit about that. That brought his recollection to another case also that involved children.

At that point, defense counsel objected and the following exchange occurred:

> Prosecutor: Let me point out that no suppression motion had been filed about this.
>
> DePersio: We know that. Nobody's talking about ....
>
> ***
> DePersio: Well, we object to any conversations

27

> concerning the homicide investigation, that's the subject
> matter of this investigation here today.
>
> Court: You have not received statements about that?
>
> Prosecutor: They have received them.
>
> DePersio: I have no idea.
>
> Prosecutor: Because he hasn't looked at the file.  Only
> Mr. Clement has copied the file, and he had it in
> Foschino's blue file that had all the statements ....

(Emphasis added).

The petitioner now argues the admissibility of the statements should have been litigated pretrial.  He points out that DePersio had not reviewed the statements before the trial began.

It is true that motions to suppress evidence must be heard before trial. Tenn. R. Crim. P. 12(a)(3).  Clearly, defense counsel should have reviewed the statements before trial.  A failure to review the statements pretrial or to file the motion to suppress pretrial, while qualifying as deficient performance, does not establish any prejudice.  Nothing in this record indicates that the statement would have been suppressed had a motion been timely filed.  This is a prerequisite for the grant of relief.  Because the petitioner has failed to show that a motion to suppress would have been successful, no prejudice could have resulted from the inaction of his counsel.

(g)

The petitioner also complains that his trial counsel was deficient for failing to effectively prepare or present psychological testimony in the sentencing phase of the trial.  He argues that attorney Clement failed to elicit sufficient testimony from Dr. Engum to support an instruction to the jury on two statutory

28

mitigating circumstances: first, that the defendant suffers from a mental disease which affected his judgment and, second, that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance. See Tenn. Code Ann. § 39-13-204(j)(2), (8). He further submits that he is entitled to relief under Goad, 938 S.W.2d at 365, where our supreme court found counsel was ineffective for failing to present "the available expert mitigating evidence of mental illness."

During the sentencing phase, the state argued three aggravating circumstances: that the murder was heinous, atrocious, and cruel; that the murder was committed to avoid arrest; and that the murder was committed in furtherance of a robbery. Tenn. Code Ann. § 39-13-204(i)(5), (6), (7). The jury found only one, that the murder was committed in furtherance of the robbery. Tenn. Code Ann. § 39-13-204(i)(7). The defense theory during the penalty phase of the trial was that the defendant had been severely abused as a child, had been abandoned repeatedly by his parents and foster parents, and had suffered a series of personal rejections, all of which should mitigate against a death sentence.

Dr. Eric Engum testified during the penalty phase that the petitioner suffered from borderline personality disorder, which is a "long-term personality disorder dysfunction that manifests itself in impulsive[ness] and unpredictability in behavior, emotional withdrawal from people ... times of intense anger... [and] a sense of loss of personal identity." The most important consequence of this disorder is the "inability to maintain any kind of enduring relationship with other people."

Dr. Engum explained that several factors contributed to the formation

29

of this disorder.  The petitioner's mother was an alcoholic who abandoned him at a very early age; in consequence, the initial maternal attachment never occurred.  It also developed that the petitioner never had any contact with his father.  Dr. Engum learned from recorded data that the petitioner had been transferred from one foster home to another.  Records indicated that the petitioner was forced to sleep in the basement of one home while the foster parents focused all of their attention on their biological children.  He was also abused while living in the home.  Eventually, the petitioner was discovered "playing doctor" with one of the foster parents' biological children and was placed in Devereau Foundation, which is a home for severely emotionally disturbed children.  The petitioner ran away from the Devereau Foundation several times.

Based upon many of the same circumstances, Dr. Engum testified that the petitioner also suffered from "Burned" or Abandoned Child Syndrome.  Dr. Engum testified that individuals diagnosed with this syndrome have repeatedly suffered emotional injuries and eventually withdraw "into [a] shell."

Dr. Engum testified that the petitioner became a drifter and, after being released from Devereau, never established any lasting relationships, although he had an "on-again, off-again" relationship with a woman named Mary, who is the mother of his two children.  The petitioner had been institutionalized from time to time and functioned well in that type of environment.  At one point, after his release from Devereau, the petitioner was institutionalized at West Texas Hospital. The hospital diagnosed the petitioner as having a factitious disorder, which occurs when an individual feels so helpless and isolated that he seeks to play the role of patient. On cross-examination by the state, Dr. Engum conceded that between 500,000 and two million people suffer from a borderline personality disorder.

At a bench conference during the trial, the trial judge and counsel discussed which of the statutory mitigating circumstances should be instructed to the jury. One of the mitigating circumstances discussed was that the "murder was committed while the defendant was under the influence of extreme mental or emotional disturbance." Tenn. Code Ann. § 39-13-204(j)(2). The trial judge suggested that there might be no proof of that circumstance and DePersio, who had yielded psychological preparations to Attorney Clement, inexplicably agreed, simply saying that one was "out." Another claimed mitigating circumstance was that the "capacity of the defendant to appreciate the wrongfulness of [his] conduct or to conform [his] conduct to the requirements of the law was substantially impaired as a result of mental disease or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected the defendant's judgment." Tenn. Code Ann. § 39-13-204(j)(8). The trial judge, apparently referring to the insanity defense as defined in Graham v. State, 547 S.W.2d 531 (Tenn. 1977), refused to instruct on that mitigating circumstance because "the magical words ... weren't developed during proof." Defense counsel did lodge an objection to the refusal to charge Tenn. Code Ann. § 39-13-204(j)(8).

The trial judge provided the following instruction to the jury on mitigating circumstances:

> In arriving at this determination, you are authorized to weigh and consider any mitigating circumstances and any of the statutory aggravating circumstances which may have been raised by the evidence throughout the entire course of this trial, including the guilt-finding phase or the sentencing phase or both.
>
> ***
>
> Tennessee Code Annotated 39-2-203(j), provides that in arriving at the punishment, the jury shall consider as heretofore indicated any mitigating circumstances which shall include, but not be limited to, the following:

31

Number one, the murder was committed under circumstances which the defendant reasonably believed to provide a moral justification for his conduct; two, any aspect of the defendant's character or record, or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

If you unanimously determine that at least one statutory aggravating circumstance or several statutory aggravating circumstances have been proved by the State beyond a reasonable doubt, and said circumstance or circumstances outweigh any mitigating circumstance or circumstances, the sentence shall be death. The jury shall state in writing the statutory aggravating circumstance or statutory aggravating circumstances so found, and signify in writing that the statutory aggravating circumstance or circumstances outweigh the mitigating circumstance or circumstances so found.

On direct appeal of the conviction and sentence, the defendant argued that the trial court erred by refusing to instruct Tenn. Code Ann. § 39-13-204(j)(2) and (8). By a 3-2 vote, our supreme court rejected the claim:

Defendant says he was prejudiced by failure to instruct mitigating circumstances [Tenn. Code Ann. § 39-13-204(j)(2) and (8)] raised by the evidence. ... The trial court declined to instruct the jury on these factors because he found no evidence in the record that <u>as a result</u> of mental disease the defendant could not conform his conduct to the requirements of the law. ... The trial court was of the opinion that the disorder was <u>prevalent even among law abiding persons, and in the absence of specific proof or a statement of causation about the relationship between the disorder and the offense, the instruction was not warranted.</u> We do not find anything in the record to dispute this finding. The issue is without merit.

<u>Brimmer</u>, 876 S.W.2d at 82-83 (second emphasis added).

The majority of our supreme court decided that the failure of the defense to prove the connection between the anti-social personalty disorder and the offense precluded instructions on the statutory mitigating circumstance. <u>Id.</u> (No mention was made of Dr. Engum's diagnosis of Abandoned Child Syndrome). Two

32

of the five justices dissented from this ruling, concluding that the petitioner had established that he suffered from a mental disease or diseases which could impair his ability to appreciate the wrongfulness of his conduct or conform his conduct to the law. The dissent argued that there should be no requirement to establish any connections between the disorder or disorders and the criminal acts of the defendant, suggesting that the majority had confused the concepts of the insanity defense and mitigating circumstances. One of the dissenters proclaimed that the use of the "magical words" in this context was absolutely unnecessary. See Brimmer, 876 S.W.2d at 88 (Reid, Ch. J., and Daughtrey, J., dissenting); Tenn. Code Ann. § 39-13-204(j)(8). Neither the majority nor the dissenting opinions commented upon the applicability of Tenn. Code Ann. § 39-13-204(j)(2), that is, that the murder was committed while the defendant was under the influence of extreme mental or emotional disturbance. Id. That is understandable; DePersio, of course, had conceded at trial that this possible mitigating circumstance had no application.

At the post-conviction hearing, Dr. Engum testified that in January of 1991, well before trial, he advised defense counsel that the petitioner was competent and that an insanity defense could not be supported. At that time, he also mentioned to defense counsel that he believed there to be mitigating evidence available to the petitioner. He recalled that the next time he was asked to discuss his possible testimony was "about an hour or so before the sentencing phase of the trial began." "After he told them [he] couldn't support the Graham standard, and found him competent [he] told them that [he] could say something in sentencing, [but he] didn't hear from them again until the day the trial started." Dr. Engum asserted that he could have testified that both of the statutory mitigating circumstances at issue, Tenn. Code Ann. § 39-13-204(i)(2) and (8), were present; he testified that defense counsel "absolutely" never mentioned either of these

33

mitigating circumstances before or during his testimony.

At the evidentiary hearing on this post-conviction claim, Dr. Engum uncategorically stated that in his opinion "David Brimmer committed this offense while under the influence of extreme mental or emotional disturbance." See Tenn. Code Ann. § 39-13-204(j)(2). He also testified that "David Brimmer's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law, was substantially impaired as a result of mental disease or defense--insufficient to establish a defense to the crime, but which substantially affected his judgment." See Tenn. Code Ann. § 39-13-204(j)(8). Other than these specific references to the enumerated mitigating circumstances, the testimony of Dr. Engum at trial and on post-conviction was essentially the same.

Attorney Clement testified that he conducted the entire examination of Dr. Engum at the sentencing hearing. He recalled being generally satisfied with the content of Dr. Engum's testimony despite the trial court's refusal to give jury instructions on the two statutory mitigating circumstances in question.

The post-conviction court made the following findings:

(B) Failure to investigate and present evidence of mitigating factors relating to his background and mental state at the sentencing. Trial counsel presented expert testimony at sentencing hearing phase ... relating to abandoned child syndrome. [A]n investigator testified at the original trial concerning petitioner's troubled childhood.... The jury had ample evidence of petitioner's background and mental history. [W]hile ... some evidence [was] presented at post-conviction evidentiary hearing that the expert may not have been prepared until later stages of [] investigation, [no prejudice has been shown.]

This finding suggests an "investigator testified concerning petitioner's

34

troubled childhood." The transcript of the sentencing hearing does not support that conclusion. The reference to an "investigator" may have been inadvertent because the only witness who testified for the petitioner in the sentencing phase was Dr. Engum. The finding does not address the more important question of whether the petitioner was prejudiced by defense counsel's failure to elicit testimony which would have supported jury instructions on the relevant statutory mitigating circumstances.

Both the petitioner and the state have addressed this issue under Goad v. State, 938 S.W.2d 363 (Tenn. 1996), a case in which the supreme court set forth the standards for reviewing claims of ineffective assistance of counsel for failure to present available mitigating evidence in the sentencing phase of a capital trial. While acknowledging that defense counsel does have a duty to prepare and represent the client, our supreme court in Goad held that there is no absolute requirement that counsel present mitigating evidence at the sentencing hearing. Goad, 938 S.W.2d at 369, 370. Where mitigating evidence does exist, however, it should be presented. Id. Our supreme court has emphasized the duty of trial courts to "preserv[e] a defendant's right to counsel at a capital sentencing hearing." Id. (internal quotation marks omitted). In Cooper v. State, this court held that "'[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to the facts relevant to the merits of the case and the penalty in the event of conviction.'" 847 S.W.2d 521, 531 (Tenn. Crim. App. 1992) (quoting A.B.A. Standards for Criminal Justice (2d ed.), The Defense Function § 4-4.1), aff'd, 849 S.W.2d 744 (Tenn. 1993).

The comments to this section have been quoted with approval by this court in Adkins v. State, 911 S.W.2d 334, 356 (Tenn. Crim. App. 1994):

> The lawyer also has a substantial and important role to perform in raising mitigating factors both to the

> prosecutor initially and to the court at sentencing. This cannot effectively be done on the basis of broad general emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, ... relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself. Investigation is essential to fulfilment of these functions.

The United States Supreme Court has held that mitigating evidence is relevant to sentencing hearings and should be presented. See generally California v. Brown, 479 U.S. 538 (1987); Mills v. Maryland, 486 U.S. 367 (1988) (a reversal because it was probable that the jury imposed a death sentence under the impression that the state statutory scheme prevented jurors from considering any mitigation they did not find unanimously to exist); Hitchcock v. Dugger, 481 U.S. 393 (1987) (the death sentence was set aside because the trial court barred evidence of non-statutory mitigation at the sentencing hearing); Lockett v. Ohio, 438 U.S. 586 (1978) (an Ohio statute limiting mitigation to three statutory factors was unconstitutional; the jury must not be precluded from considering any aspect of the defendant's character or the circumstances of the offense).

This situation, however, is different from that in Goad. Here, defense counsel did present all of the then available mitigating evidence during the sentencing phase. The concern is not that defense counsel failed to present the available mitigating evidence. It is that he presented expert testimony in such a deficient manner that it justified the trial court's refusal to instruct on the two available mitigating circumstances. Defense counsel did not establish an adequate foundation for either mitigating circumstance to be charged to the jury. In the words of our supreme court on direct appeal, defense counsel failed to elicit a "statement of causation about the relationship between the disorder [or disorders] and the offense." Brimmer, 876 S.W.2d at 83. The significant question now is whether the

36

failure to present the testimony in a way which would have warranted an instruction on the statutory mitigating circumstances affected the reliability of the death sentence.

As indicated, Dr. Engum testified at the evidentiary hearing on this post-conviction claim that there was a connection between the petitioner's two mental disorders and his crimes. This testimony would have been presented in relation to the statutory mitigators during the sentencing phase of the trial had the proper questions been presented by defense counsel. Of equal importance is that each of the two mitigating circumstances prescribed by statute would have been read to the jury. It is our view that counsel was deficient for failing to offer the "specific proof or a statement" of the relationship between the petitioner's mental problems and the offenses committed. Id.

Attorney DePersio, the more experienced of the attorneys assigned to represent the petitioner, expressed little interest in the penalty phase of the trial. At least partly due to his general cynicism about psychological testing and perhaps for other reasons, he left the preparations of the expert witness entirely to his co-counsel. Attorney Clement, who was involved in his first capital case, worked diligently during the short period between his appointment and the trial but was burdened with the responsibility of preparing the testimony of Dr. Engum when he had never before utilized an expert in a criminal case. Under these circumstances, his failure to submit the "magical words" sought by the trial judge or otherwise articulate a legitimate basis for a jury instruction on the statutory mitigating circumstances at issue is entirely understandable.

This deficiency is of sufficient magnitude, in our view, as to establish

the required prejudice component. In <u>Strickland</u>, the United States Supreme Court held that a "defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." 466 U.S. at 693. Rather, he must show a "reasonable probability ... [that] the result of the proceeding would have been different." <u>Id.</u> at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 695. The Supreme Court offered the following guidance on determining whether prejudice has been established:

> In making this determination, a court ... must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and the factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.

<u>Id.</u> at 695-96.

The jury was instructed that if the "statutory aggravating circumstance[s] ... outweigh any mitigating circumstance ..., <u>the sentence shall be death</u>." The instructions on the possible aggravating circumstances were very specific and tracked the statute. In contrast, the instruction to the jury on mitigating circumstances was brief and general. It was almost inevitable that the jury would conclude that at least one aggravating circumstance was present, i.e., that the murder was committed in furtherance of a felony. <u>See</u> Tenn. Code Ann. § 39-13-204(i)(7). Because no specific instructions were given on the statutory mitigating circumstances and because the instructions contained mandatory language that if the aggravating circumstances outweigh the mitigating circumstances, the "sentence shall be death," the errors by the defense made a sentence of death more likely.

38

This situation is analogous to that in Adkins, 911 S.W.2d at 334. In Adkins, this court ordered a new sentencing hearing because no mitigating evidence, even though available, had been presented by defense counsel. The error was deemed egregious: "[W]hen the state presented proof of two aggravating circumstances and [defense] counsel ... offered no mitigating evidence, the jury had little choice but to impose the death sentence." Id. at 356 (emphasis added).

Our supreme court has previously recognized the significant effect of the failure to provide jury instructions on mitigating circumstances. In State v. Odom, 928 S.W.2d 18, 32 (Tenn. 1996), our supreme court granted a new sentencing hearing when the trial judge refused to provide instructions on various nonstatutory mitigating circumstances. The court determined that when a trial court refuses to give an instruction on a mitigating circumstance, he "in effect, give[s] it no weight by excluding such evidence from the jury's consideration." Id. at 31 (emphasis added). The supreme court warned of the importance of this portion of the charge:

> The jury instructions [on mitigating circumstances] are critical in enabling the jury to make a sentencing determination that is demonstrably reliable. To ensure this reliability, the jury must be given specific instructions on those circumstances offered by the capital defendant as a justification for a sentence less than death.

928 S.W.2d at 31 (emphasis added).

That rationale applies in this case. It is noteworthy that since the release of the opinion in Odom, our supreme court has had two additional opportunities to consider whether error associated with jury instructions on mitigating evidence required reversal. State v. Hodges, 944 S.W.2d 346, 352 (Tenn.), cert. denied, 118 S. Ct. 567 (1997); State v. Hall, 958 S.W.2d 679 (Tenn. 1997), cert. denied, _____ S. Ct. _____, 1998 WL 145257 (June 22, 1998). In Hodges, the

39

defendant complained that the trial court erred by denying his requested instructions on nonstatutory mitigating circumstances. 944 S.W.2d at 351. Instead, the trial court had instructed the jury on the following nonstatutory mitigating circumstances: history of childhood; victim of child sex abuse; mental illness or mental or emotional disturbance; dominance by another person and/or immaturity; drug abuse; and any other aspect of the defendant's background or character or the circumstances of the offense, which would reduce the defendant's blameworthiness. Id. at 355.

The supreme court emphasized that a jury instruction on mitigating circumstances can be found "prejudicially erroneous" only if "it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." Hodges, 944 S.W.2d at 352. The court observed that "'[j]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might.'" Id. at 352 (quoting Boyde v. California, 494 U.S. 370, 380-81 (1990)).

> Our high court explained as follows:
>
> Jurors interpret the instructions in a common sense manner and in light of the evidence presented at the trial. The defense assertion ignores the reality that these jurors had heard specific evidence during the sentencing hearing about the defendant's childhood, his immaturity, alleged sexual abuse, drug abuse, mental illness and emotional disturbance, as well as the dominance by Trina Brown. By their breadth, the instructions on nonstatutory mitigating circumstances encompassed all the evidence presented by the defense at the sentencing hearing. ... [T]he defendant's claim of error is without merit.

Hodges, 944 S.W.2d at 356 (citations omitted). While the instructions specifically requested by the defendant were not given, other instructions, as enumerated above, were provided to the jury which "encompassed all the evidence" the defendant presented. Id.

40

In Hall, the trial court refused to grant seven different requested instructions on nonstatutory mitigating circumstances which dealt with the defendant's youth, immaturity, and emotional problems. 958 S.W.2d at 697-98. Our supreme court found the trial court's refusal to give the requested charge did not constitute "prejudicial error." Id. at 698. Two factors were critical to the court's conclusion. First, the rejected instructions on nonstatutory mitigating circumstances had already been addressed in the instructions provided on statutory mitigating circumstances. Second, the trial judge did provide an additional instruction on mitigating evidence:

> A mitigating circumstance is any aspect of Leroy Hall, Jr.'s, character, background history, or physical condition or the nature and circumstances of the crime which in fairness or mercy, calls for a sentence less than death. ... The law does not identify or limit what you can consider concerning [Hall's] character, background history, any physical condition or the nature and circumstances of the crime that are mitigating.

Hall, 958 S.W.2d at 697.

In both Hall and Hodges, the trial judge denied certain of the defendant's requested instructions; new sentencing hearings were denied by the supreme court only because other instructions were given which were substantially the same as those rejected. In each case, the instructions fairly submitted the legal issues to the jury. The jury was given detailed instructions on the statutory and nonstatutory mitigating circumstances raised by the evidence.

This case is less like either Hodges or Hall than Odom, wherein our supreme court ruled that where the appropriate instruction on mitigating evidence is not provided, that evidence is, for practical purposes, "exclud[ed] ... from the jury's consideration." 928 S.W.2d at 31. Due to his counsel's errors in this case, instructions permitting the jury to consider that the defendant suffered from a mental

41

disease or that the murder was committed while the defendant was under extreme mental disturbance were rejected. See Tenn. Code Ann. § 39-2-204(j)(2), (8). A brief, general instruction that the jury could consider "any aspect of the defendant's character or record, or any aspect of the circumstances of the offense favorable to the defendant" was inadequate because it failed to address the defendant's mental illness or mental condition at the time of the offense. "To ensure ... reliability, the jury must be given ... instructions on those circumstances offered by the capital defendant as a justification for a sentence less than death." Odom, 928 S.W.2d at 31.

Because the jury imposed the sentence of death without being allowed to consider either of these mitigating circumstances, the death sentence is unreliable and our confidence in the verdict has been undermined. Strickland, 466 U.S. at 695. The proof by the state was not so overwhelming that the jury would have inevitably imposed the death sentence. The jury rejected two of the aggravating circumstances submitted by the state. The single remaining aggravating circumstance was that the murder was committed in furtherance of a felony. Thus, the instructions warranted by the evidence might have made a difference in the sentence imposed by the jury. Under these circumstances, a new sentencing hearing must be granted.

(h)

The petitioner also argues counsel was ineffective for failing to include all possible grounds for relief in the motion for new trial. Specifically, the petitioner complains that the following issues should have been presented: the confusing nature of the jury instructions on mitigating circumstances, the prejudicial statements by Sheriff Hodges about the petitioner's having "killed before," the prosecutor's

argument about petitioner's having "killed before," and the court's refusal to charge the requested mitigating circumstances.

The petitioner's complaint about the "confusing nature of the jury instructions on mitigating circumstances" is unclear. The petitioner has not indicated why the general instructions provided on possible mitigating circumstances are unclear. The real problem, as indicated, is trial counsel's failure to prepare and present the available evidence to substantiate a charge on the possible statutory mitigating circumstances.

Counsel attempted to raise the issues about the testimony and argument about the "killed before" issue on direct appeal. The supreme court ruled as follows:

> Our investigation of these complaints indicates initially the issue was waived. There was no contemporaneous objection when any of these allegedly objectionable remarks were made. Defendant did not request the Court to instruct the jury to disregard comments about other killings. The record indicates that Sheriff Hodges was not being responsive to the State's questions when the reference to prior killings was made. There is no indication the State intentionally elicited these remarks. Moreover, this issue was not raised on the motion for new trial. Certainly it would have been better if none of the remarks had been made …. Under the circumstances and evidence in this case we do not think these incidents constitute reversible error.

Brimmer, 876 S.W.2d at 80. Although counsel may have been deficient in failing to raise that particular issue in the motion for new trial, we cannot find prejudice because the supreme court reviewed the substance of the complaint and ruled no reversible error occurred.

The petitioner also complains that counsel should have included in the motion for new trial that the court refused to charge the requested mitigating

43

circumstances. On direct appeal, the defendant argued "he was prejudiced by failure to instruct mitigating circumstances raised by the evidence." Id. at 82. The supreme court reviewed the issued and found it to be "without merit." Id. at 83. Because the supreme court reviewed the merits of this issue, the petitioner has shown no prejudice.

(i)

The petitioner also complains that counsel was ineffective for failing to present as an issue the twenty-one-day detention of the petitioner prior to his giving a confession. An unreasonable length of detention without a probable cause determination violates the Constitution. Gernstein v. Pugh, 420 U.S. 103 (1975). At the time of petitioner's trial, Tennessee followed the "seventy-two hour rule" which required a probable cause determination within seventy-two hours. Wynn v. State, 181 S.W.2d 332, 334 (Tenn. 1944); see also State v. Readus, 764 S.W.2d 770 (Tenn. Crim. App. 1988).

Given the facts of the case, we have no hesitation in concluding that trial counsel should have pursued this as a means of suppressing the confession. That determination does not end our inquiry, however, as the petitioner must still show prejudice. As we explain in more detail below, we conclude the petitioner is entitled to no relief because he has not demonstrated by a preponderance of the evidence that he did not receive a prompt determination of probable cause. That determination controls our resolution of this issue. Because we cannot conclude counsel would have prevailed on the motion to suppress, we cannot find prejudice as required under Strickland.

44

II

The petitioner next argues that his confession should be suppressed because he was held in custody for forty days before a probable cause determination occurred. See State v. Huddleston, 924 S.W.2d 666 (Tenn. 1996). In Gerstein v. Pugh, 420 U.S. 103, 114, 125 (1975), the United States Supreme Court ruled that the "Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty following arrest" and that the determination "must be made ... either before or promptly after arrest."

In 1991, the Supreme Court defined what is "prompt" under Gerstein. County of Riverside v. McLaughlin, 500 U.S. 44 (1991). The Court ruled that a "judicial determination of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement of Gerstein." Id. at 56. For hearings occurring before forty-eight hours pass, the arrested individual must "prove that his or her probable cause determination was delayed unreasonably." Id. The Court found, however, that where a probable cause determination occurs after forty-eight hours, the "burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." Id. at 57. The Supreme Court has held that the rule in McLaughlin, "'is to be applied retroactively to all cases, state or federal, ... not yet final' when the rule [was] announced." Powell v. Nevada, 511 U.S. 79, 80 (1994) (quoting Griffith v. Kentucky, 479 U.S. 314, 328 (1987) (omission in original)).

Our supreme court has held that where the rule in McLaughlin is violated, the exclusionary rule is the appropriate remedy. Huddleston, 924 S.W.2d at 673. The court ruled that "applying the exclusionary rule to evidence obtained as a result of the illegal detention will deter further violations." Id. Any confession

45

obtained in violation of <u>McLaughlin</u> must be excluded unless the state can demonstrate the confession is "sufficiently an act of free will to purge the primary taint." <u>Id.</u> at 674. Four factors are relevant in reaching this determination:

(1) the presence or absence of <u>Miranda</u> warnings;

(2) the temporal proximity of the arrest and the confession;

(3) the presence of intervening circumstances; and finally, of particular significance,

(4) the purpose and flagrancy of the official misconduct.

<u>Id.</u> at 674-75. The burden of proving the admissibility of the confession rests on the prosecution. <u>Id.</u>

The petitioner argues that he is entitled to relief under <u>Huddleston,</u> insisting its rule of exclusion is a new law which should be applied retroactively. In our view, however, the petitioner has failed to demonstrate by a preponderance of the evidence that he did not receive a prompt judicial determination of probable cause.

On February 3, 1990, the petitioner was arrested in Refugio County, Texas, on charges unrelated to this case. The next day, he appeared before a Justice of the Peace. Bail was set at $1000. The petitioner was unable to secure a release. On February 24, 1990, the petitioner signed a written confession. On March 1, 1990, he was returned to this state to face the first degree murder charge. A preliminary hearing was held on this charge on March 15, 1990.

On February 4, 1990, a Texas magistrate signed the following document:

Before me, the undersigned magistrate of the

46

State of Texas on this day personally appeared [the defendant] ... and said person was given the following warning by me:

(1) You are charged with the offense of evading arrest. An affidavit charging you with this offense ... (has not) been filed in this Court. [the option on the form stating an affidavit <u>has</u> been filed was marked through, indicating an affidavit had not been filed].

(2) You have a right to hire a lawyer and have him present prior to and during any interview and questioning by peace officers or attorneys representing the State. ...

(3) You have the right to remain silent.

(4) You are not required to make a statement, and any statement you make can and may be used against you in Court.

(5) You have the right to stop any interview or questioning at any time.

[an option (6) to advise of the right to an examining trial was marked through, indicating the petitioner was not advised of the right to an examining trial].

***

Check while reading. [Rights (1) through (5) are checked off; but right (6) to an examining trial was not checked].

Place of Warning: Refugio Co. Jail

The petitioner argues that two inferences may be drawn from this document. First, the magistrate could not have made a probable cause determination at the time the document was completed because an affidavit charging the offense had not yet been filed. Second, because he was not advised of his right to an examining trial, he never received one. The petitioner did not offer testimony on this issue at the evidentiary hearing.

At the conclusion of the hearing, the trial court made the following findings of fact:

[T]he petitioner claims that he was not properly taken before a magistrate for a probable cause hearing and remained in custody illegally for twenty-one days before confessing to the murder of Rodney Compton. At the post conviction evidentiary hearing, proof was presented showing that the petitioner was taken before a magistrate within twenty-four hours of his arrest in Texas on other

47

charges. A one thousand dollar bond was granted, which the petitioner could not make, and the petitioner confessed to the Tennessee offenses twenty-one days later while in custody for the Texas offenses. This Court concludes that the petitioner has failed to carry his burden of proof with respect to this issue. There has been insufficient proof presented that the confessions were taken in violation of the petitioner's Fourth Amendment rights.

The response of the state completely fails to address the legal issue. It insists that the issue is moot because the petitioner failed to prove this allegation. The state argues the petitioner should have presented more proof that he did not receive a probable cause determination. It insists that the petitioner should have offered the testimony of the Texas magistrate regarding the admonition of his rights and should have presented testimony about the standard procedures and forms employed in Refugio County or the nature of an examining trial in Texas.

In his reply brief, the petitioner submits that Texas law clarifies the state's concerns. Relevant sections of the Texas Code of Criminal Procedure were attached to the reply brief as an addendum.

Our rules of evidence provide for mandatory judicial notice of statutory law in Texas:

> Rule 202. Judicial notice of law.--Mandatory Judicial Notice of Law.--The court shall take judicial notice of (1) the common law, (2) the constitutions and statutes of the United States and of every state, territory, and other jurisdiction of the United States, (3) all rules adopted by the United States Supreme Court or by the Tennessee Supreme Court, and (4) any rule or regulation of which a statute of the United States or Tennessee mandates judicial notice.

Tenn. R. Evid. 202(a).

In Texas, the statutory law provides for at least two types of pre-trial hearings: (1) an initial appearance before a magistrate where one is advised of certain rights, and (2) an examining trial. See Tex. Code Crim. P. Ann. art. 15.17, 16.01. Article 15.17(a) governs the initial appearance and provides in part:

(a) In each case enumerated in this Code, the person making the arrest shall without unnecessary delay take the person arrested or have him taken before some magistrate of the county where the accused was arrested or, if necessary to provide more expeditiously to the person arrested the warnings described by this article, before a magistrate in a county bordering the county in which the arrest was made. The arrested person may be taken before the magistrate in person or the image of the arrested person may be broadcast by closed circuit television to the magistrate. The magistrate shall inform in clear language the person arrested, either in person or by closed circuit television, of the accusation against him and of any affidavit filed therewith, of his right to retain counsel, of his right to remain silent, of his right to have an attorney present during any interview with peace officers or attorneys representing the state, of his right to terminate the interview at any time, of his right to request the appointment of counsel if he is indigent and cannot afford counsel, and of his right to have an examining trial. He shall also inform the person arrested that he is not required to make a statement and that any statement made by him may be used against him. The magistrate shall allow the person arrested reasonable time and opportunity to consult counsel and shall admit the person arrested to bail if allowed by law.

Under Texas law, an "examining trial" in felony cases is described in part as follows:

Article 16.01. Examining trial
When the accused has been brought before a magistrate for an examining trial that officer shall proceed to examine into the truth of the accusation made, allowing the accused, however, sufficient time to procure counsel. In a proper case, the magistrate may appoint counsel to represent an accused in such examining trial only, to be compensated as otherwise provided in this Code. The accused in any felony case shall have the right to an examining trial before indictment in the county having jurisdiction of the offense, whether he be in custody or on bail, at which time the

49

> magistrate at the hearing shall determine the amount or
> sufficiency of bail, if a bailable case.

(Emphasis added). Other sections provide guidance on how the examining trial is conducted and prescribe the calling and cross-examining of witnesses. Id., art. 16.06, .07. "The same rules of evidence shall apply to and govern a trial before an examining court that apply to and govern a final trial." Id., art. 16.07. In our view, the examining trial in Texas is similar to a preliminary hearing in this state. See Tenn. R. Crim. P. 5(a).

The record suggests that the petitioner did have an initial appearance as required under Article 15.17. Because the Texas document indicates an affidavit charging an offense had not been filed with the court, it is not likely that a judicial determination of probable cause was made at that time.

We also agree it is likely that the petitioner did not have an examining trial. The offenses with which the petitioner was charged, evading arrest, driving without a license, and driving without insurance, were all misdemeanors. See Tex. Penal Code Ann., art. 521.025 (providing that a violation of the law requiring that a license be carried is a misdemeanor); art. 601.191 (providing that a violation of the motor vehicle liability insurance requirement is a misdemeanor); and art. 38.04 (providing that evading arrest is a Class B misdemeanor, unless a peace officer suffers serious bodily injury due to the escape, which is a felony). Under Texas law, the petitioner would not be entitled to an examining trial for the misdemeanor offenses. Tex. Code Crim. P. Ann., art. 16.01.

The record leaves open the possibility that the petitioner may not have received a prompt judicial determination of probable cause. It does not, however, establish by a preponderance of the evidence that he did not. In Gerstein, the

United States Supreme Court provided guidance on what type of procedure would satisfy the requirement of a prompt judicial determination of probable cause. The Court observed the safeguards built into a preliminary hearing, such as the calling and cross-examination of witnesses and the appointment of counsel, are not constitutionally required for a probable cause determination. 420 U.S. at 119-20. The hearing does not have to be adversarial. Id. at 120. The Court ruled that hearsay and written testimony may be adequate for the judicial determination of whether there is probable cause. Id. The Court explained that the use of an "informal procedure is justified not only by the lesser consequences of a probable cause determination but also by the nature of the determination itself." Id. at 122.

That there was not an examining trial in Texas and that the magistrate did not determine probable cause at the initial appearance does not make it more likely than not that an informal procedure was not used at another constitutionally permissible time. The record does not include papers filed in court in Refugio County. The proof in the record is inadequate for any determination that a constitutional violation occurred.

In Green v. State, 872 S.W.2d 717, 718 (Tex. Crim. App. 1994), the court observed that the probable cause determination was noted on the "docket sheet." The court presumed this probable cause determination was made to satisfy the rule in Gerstein. Id. at 721. Such an informal procedure in this case would have satisfied constitutional guidelines. The burden in a post-conviction case is on the petitioner to demonstrate his claim by a preponderance of the evidence. He has not done so on this issue.

51

III

The petitioner complains that prosecutorial misconduct occurring during the course of the trial requires reversal. Specifically, he complains that the prosecutor's arguments repeating and emphasizing Sheriff Hodges' testimony that the petitioner had "killed before" were highly prejudicial and improper.

Initially, we note this claim has been waived. The post-conviction statute in effect when the petition was filed defines waiver:

> (b)(1) A ground for relief is waived if the petitioner knowingly and understandingly failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented.
>
> (2) There is a rebuttable presumption that a ground for relief not raised in any such proceeding which was held was waived.

Tenn. Code Ann. § 40-30-112(b) (repealed 1995). Our supreme court has held that "the rebuttable presumption of waiver is not overcome by an allegation that the petitioner did not personally, knowingly, and understandingly fail to raise a ground for relief." House v. State, 911 S.W.2d 705, 714 (Tenn. 1996). The court continued, "[w]aiver in the post-conviction context is to be determined by an objective standard under which a petitioner is bound by the action or inaction of his attorney." Id. Clearly, this claim of prosecutorial misconduct was available on direct appeal. We will nonetheless briefly address the merits.

As stated previously, Sheriff Hodges testified that the petitioner acknowledged to him that he had "killed before." The last statements made during closing argument by the state were as follows: "Recall what the Sheriff said to him when he was alone with him. He said, 'Son, you've killed before.' [A]nd that's true, members of the jury, not speculation."

Our supreme court recently reaffirmed several well-established guidelines which control closing argument:

> We have recognized that closing argument is a valuable privilege for both the State and the defense and have allowed wide latitude to counsel in arguing their cases to the jury. Nonetheless, closing argument is subject to the discretion of the trial judge, and must be temperate, predicated on evidence introduced during the trial, and relevant to the issues being tried.

State v. Ronnie Michael Cauthern, _____ S.W.2d _____, No. 02C01-9612-CC-00108, slip op. at 18 (Tenn., at Jackson, Mar. 23, 1998) (citations omitted).

In our assessment, however, any misconduct on the state's part did not affect the jury's verdict in this case. The test to be applied in reviewing a claim of prosecutorial misconduct is "whether the improper conduct could have affected the verdict to the prejudice of the defendant." Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). The factors, set out in Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), and adopted by the Tennessee Supreme Court in State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984), are as follows:

> (1)    the conduct complained of, viewed in light of the facts and circumstances of the case;
>
> (2)    the curative measures undertaken by the court and the prosecution;
>
> (3)    the intent of the prosecutor in making the improper statement;
>
> (4)    the cumulative effect of the improper conduct and any other errors in the record; and
>
> (5)    the relative strength or weakness of the case.

The first factor, the conduct complained of, weighs for the petitioner. The argument was patently improper. See Tenn. R. Evid. 404(b). The second factor, the curative measures undertaken by the court and the prosecution, also weighs for the

petitioner.  Neither the state nor the court made any attempt to cure this error.  The third factor, the intent of the prosecutor, also weighs for the petitioner as there is no legitimate reason for the conduct.  The fourth factor weighs for the state, as there were no other instances of misconduct.  The final factor, which we find controlling, is the strength of the case.  Given the confession, the strength of the case was overwhelming.  In our view, the improper conduct did not contribute to the guilty verdict.  Thus, the issue is without merit.

## IV

Counsel for the petitioner has raised a myriad of issues in an attempt to preserve the issues for future litigation.[6]  Specifically, he raises the following issues:

(1)  whether the trial court erred by limiting the questioning of prospective jurors about their attitudes about the death penalty;

(2)  whether the trial court erred by refusing to allow certain jurors to be challenged for cause and excluding other jurors;

(3)  whether the trial court gave erroneous definitions of "reasonable doubt" during voir dire and in the guilt and penalty phases;

(4)  whether the trial court erred by allowing the introduction of irrelevant and prejudicial evidence;

(5)  whether the trial court erred by giving instructions that relieved the prosecution of the burden of proving all elements of the offense;

(6)  whether the trial court erred by excluding the petitioner's mental health records during the guilt phase;

(7)  whether the trial court erred by refusing to allow the jury to review the petitioner's

---

[6]These issues are listed in an addendum to the brief.

written statement during jury deliberation;

(8)     whether the prosecutor failed to disclose evidence;

(9)     whether the prosecution failed to perform adequate testing or concealed test results obtained from the crime scene;

(10)    whether prosecutorial misconduct requires reversal;

(11)    whether the district attorney for Anderson County abused his discretion by seeking the death penalty in this case;

(12)    whether the Tennessee Supreme Court's proportionality review violates due process in that the court has failed to promulgate the standards by which it conducts its review;

(13)    whether the absence of an instruction allowing the jury to impose a life sentence based on mercy is unconstitutional;

(14)    whether the mandatory imposition of the death penalty upon a finding that aggravating circumstances outweigh the mitigating circumstances is unconstitutional;

(15)    whether Tenn. Code Ann. § [39-13-204(i)(7)] fails to narrow the class of persons eligible for the death penalty;

(16)    whether the death penalty unlawfully infringes upon the petitioner's right to life;

(17)    whether the death penalty is per se cruel and unusual punishment;

(18)    whether the trial court's exclusion of Dr. Engum's testimony during the guilt phase violated constitutional rights; and

(19)    whether the cumulative effect of all these errors violates petitioner's constitutional rights.

We must conclude that none of these issues present a basis for relief.

55

First, all of the issues are waived under Rule 10, Tenn. Ct. Crim. App., which provides that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Several of the issues have been waived under the post-conviction statute because they were available at trial but not pursued at that time. See Tenn. Code Ann. § 40-35-112(B) (repealed 1995). Others are waived for failure to present any proof at the post-conviction hearing to support the claim. Finally, other issues have previously been decided against the petitioner. We will briefly discuss each issue.

The post-conviction statute in effect when the petition was filed defines waiver:

> (b)(1) A ground for relief is waived if the petitioner knowingly and understandingly failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented.
>
> (2) There is a rebuttable presumption that a ground for relief not raised in any such proceeding which was held was waived.

Tenn. Code Ann. § 40-30-112(b) (repealed 1995). Our supreme court has held that "the rebuttable presumption of waiver is not overcome by an allegation that the petitioner did not personally, knowingly, and understandingly fail to raise a ground for relief." House, 911 S.W.2d at 714. The court continued, "[w]aiver in the post-conviction context is to be determined by an objective standard under which a petitioner is bound by the action or inaction of his attorney." Id.

Issues (1) and (2) concerning the jury selection process have been waived because they were available at trial and on direct appeal but not pursued. See House 911 S.W.2d at 714; Tenn. Code Ann. § 40-30-112(b) (repealed 1995).

56

The third issue concerns jury instructions on reasonable doubt.  This issue is without merit.  At the guilt phase, the jury was instructed as follows:

> Reasonable doubt is not a mere possible doubt because everything relating to human affairs is open to some possible or imaginary doubt.  It is an honest doubt engendered after an investigation of all of the evidence and an inability after such investigation to let the mind rest easily as to the moral certainty of guilt.  And this certainty is required as to every essential element of the crime charged or included in this indictment.

A similar instruction was given at the penalty phase.

Several cases discuss challenges to this type of instruction.  See State v. Bush, 942 S.W.2d 489, 52 (Tenn.), cert. denied, 118 S. Ct. 376 (1997).  These challenges are based on the United States Supreme Court case, Victor v. Nebraska, 511 U.S. 1 (1994).  In Victor, the United States Supreme Court ruled that a jury might "understand [the instruction containing the phrase 'moral certainty'] to allow conviction on proof that does not meet the beyond a reasonable doubt standard." 511 U.S. at 13.  The Court ruled, however, that a reasonable doubt instruction that contained the phrase "moral certainty" might nonetheless comport with constitutional guidelines if used in conjunction with other phrases that lend content to the phrase. Id. at 15.

In State v. Nichols, 877 S.W.2d 722, 734-35 (Tenn. 1994), our supreme court considered a challenge to a jury instruction which included the term "moral certainty" used in conjunction with a charge that "[r]easonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of your verdict." Id.  The court concluded that the instruction properly reflected "the evidentiary certainty required by the 'due process' clause of the federal constitution and the 'law of the land' provision in our state constitution." Id.  In our view, Nichols controls in

57

this instance.

The fourth issue is that the trial court erred by allowing the introduction of irrelevant and prejudicial evidence. In our view, this issue is waived because it was available at trial and on direct appeal but not pursued. See House, 911 S.W.2d at 714; Tenn. Code Ann. § 40-30-112(b) (repealed 1995).

The fifth issue is whether the trial court erred by giving instructions that relieved the prosecution of the burden of proving all elements of the offense. This issue is waived because it was available at trial. In Sandstrom v. Montana, 442 U.S. 510 (1979), the United State Supreme Court ruled that jury instructions that relieve the prosecution of the burden of proving an essential element of the offense are unconstitutional. At the time of petitioner's trial, the prohibition against burden-shifting jury instructions was well-established; any complaint based on burden-shifting instructions should have been pursued at trial. See House, 911 S.W.2d at 714; Tenn. Code Ann. § 40-30-112(b) (repealed).

The sixth and seventh issues, concerning the admission of mental health records at trial and the trial court's refusal to allow the jury to review the petitioner's statement during deliberation, are waived for failure to pursue the issues at trial or on appeal. See id.

The eighth and ninth issues, concerning possible Brady violations and the state's failure to perform adequate testing on crime scene evidence, are waived because of a failure to present proof. There is no evidence at the post-conviction hearing concerning these allegations and we cannot speculate as to the substance of the claims. "We [must] decide cases ... on the basis of the record as presented

58

to us for our consideration." Dearborne v. State, 575 S.W.2d 259, 264 (Tenn. 1978). The burden is always upon the appealing party to develop a record which conveys a fair, accurate, and complete account of those proceedings which form the basis of the appeal. Id.

The tenth and eleventh issues concerning prosecutorial misconduct and abuse of discretion for seeking the death penalty are waived for failure to present them on direct appeal. House, 911 S.W.2d at 714.

The twelfth issue concerns a challenge to the way our supreme court conducts proportionality review. See State v. Bland, 958 S.W.2d 651 (Tenn. 1997), cert. denied, 118 S. Ct. 1536 (1998). This issue is waived for failure to cite any authority as well as failure to provide evidence. There is no proof in this record that the supreme court conducted an inadequate proportionality review in this case.

The thirteenth issue is whether the denial of a jury instruction allowing the jury to consider mercy is unconstitutional. First, this issue is waived for failure to cite any authority. Tenn. Ct. Crim. App. R. 10(b). Even if we were to review the merits of the issue, however, we would find for the state. The supreme court has consistently held no error occurs when a trial court refuses to give a mercy instruction. See State v. Bigbee, 885 S.W.2d 797, 813-14 (Tenn. 1994); State v. Melson, 638 S.W.2d 342, 366 (Tenn. 1982).

The petitioner next complains that the mandatory imposition of the death penalty upon a finding that the aggravating circumstances outweigh the mitigating circumstances is unconstitutional. This issue is also waived for failure to cite any authority. Tenn. Ct. Crim. App. R. 10(b). Nevertheless, our supreme court

59

has rejected this argument.  See State v. Smith, 868 S.W.2d 561, 582 (Tenn. 1994).

The petitioner also contends Tenn. Code Ann. § 39-13-204(i)(7), the felony murder aggravating circumstance, fails to narrow the class of persons eligible for the death penalty.  In State v. Middlebrooks, 840 S.W.2d 317, 346 (Tenn. 1992), a majority of our supreme court concluded that when a defendant is "convicted of first-degree murder solely on the basis of felony murder, the aggravating circumstance set out in Tenn. Code Ann. §§ 39-2-203(i)(7) (1982) and 39-13-204(i)(7) (1991), does not narrow the class of death-eligible murderers sufficiently under the Eighth Amendment to the U. S. Constitution, and Article I, § 16 of the Tennessee Constitution because it duplicates the elements of the offense." Courts have been reluctant to extend the holding in Middlebrooks and continue to uphold the constitutionality of the felony murder aggravating circumstance when used in conjunction with the jury's finding of a premeditated murder.  In Hall, our supreme court emphasized that "[i]mplicit in [the Middlebrooks holding] is the recognition that the circumstance properly may be applied if a defendant is convicted of premeditated first degree murder."  Hall, 958 S.W.2d at 692.  This issue is without merit.

The petitioner next complains that the death penalty unlawfully infringes on his right to life.  In State v. Bush, 942 S.W.2d 489, 507 (Tenn.), cert. denied, 118 S. Ct. 376 (1997), the supreme court affirmed our court's determination that the death penalty does not unlawfully infringe upon one's right to life.  (Court of Criminal Appeals' opinion affirmed and appendixed to the supreme court's opinion). The court quoted from Gregg v. Georgia, 428 U.S. 153, 183 (1976):

> [C]apital punishment is an expression of society's moral outrage at particularly offensive conduct.  This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal

processes rather than self-help to vindicate their wrongs.

Bush, 942 SW.2d at 523 (alteration in original).  This issue is therefore without merit.

The petitioner also argues the death penalty is per se cruel and unusual punishment.  Our supreme court has routinely rejected the argument that the death penalty in and of itself is cruel and unusual punishment.  See generally, State v. Dicks, 615 S.W.2d 126 (Tenn. 1981); see also State v. Cauthern, 778 S.W.2d 39, 47 (Tenn. 1989).  This complaint is without merit.

The petitioner's next complaint is that the trial court's exclusion of Dr. Engum's testimony during the guilty phase violated his constitutional rights.  This issue was previously determined on direct appeal.  "A ground for relief is 'previously determined' if a court of competent jurisdiction has ruled on the merits after a full and fir hearing."  Tenn. Code Ann. § 40-30-112(a) (repealed 1995).  A "full and fair hearing" occurs if the "petitioner is given the opportunity to present proof and argument on the petition for post-conviction relief."  House, 911 S.W.2d at 714 (footnote omitted).

This exact issue was raised on direct appeal and the supreme court ruled as follows:

> It is well within the authority of States to exclude
> evidence through the application of evidentiary rules that
> themselves serve the interest of fairness and reliability--
> even if the defendant would prefer to see that evidence
> admitted.  A trial court's decision to admit or exclude
> expert testimony cannot be disturbed on appeal unless
> there is a clear showing that the trial court has abused its
> discretion.  We find no such abuse in this case.

Brimmer, 876 S.W.2d at 79 (citations omitted).  Accordingly, this issue is without merit.

61

The petitioner's final complaint is that the cumulative effect of all of these errors requires reversal. Because we have found no merit to any of these general challenges, we need not address this issue.

The judgment of the trial court denying post-conviction relief for the offense of first degree murder is affirmed. A new sentencing hearing is granted due to the ineffective assistance of counsel in that phase of the trial.

_____
Gary R. Wade, Judge

CONCUR:


_____
Paul G. Summers, Judge


_____
William M. Barker, Special Judge