IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 18, 2002 Session

## RICHARD LEONARD MENDOZA v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Davidson County**
**No. 98-A-184     Walter C. Kurtz, Judge**

---

**No. M2001-01855-CCA-R3-PC - Filed March 28, 2003**

---

The petitioner, Richard Leonard Mendoza, appeals the denial of his petition for post-conviction relief, which alleged ineffective assistance of counsel in connection with his guilty pleas to aggravated sexual battery and that his guilty pleas were involuntary. Additionally, he insists that the post-conviction court erroneously denied funding for expert psychological services at the post-conviction level. After a thorough review of the record, we are unpersuaded that the post-conviction court's rulings, findings and conclusion are anything other than proper, and we affirm the judgment.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

David L. Raybin and Jacqueline B. Dixon, Nashville, Tennessee, for the Appellant, Richard Leonard Mendoza.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Philip H. Wehby, Assistant District Attorney General, for the Appellee, State of Tennessee.

### OPINION

On May 3, 1999, Richard L. Mendoza appeared in the Fifth Circuit Court for Davidson County, Tennessee and entered guilty pleas to two counts of aggravated sexual battery involving his minor stepdaughter, AH.[1] Pursuant to a plea agreement with the state, four counts of rape of a child were dismissed, and the petitioner was sentenced, by agreement, outside the range to consecutive twelve and one-half year sentences. The following stipulated facts were presented at the plea submission:

---

[1] It is the policy of the court to refer to minor victims of sexual offenses only by their initials.

[Prosecution Counsel]:  If this case had gone to trial the court and the jury would have heard testimony that the victim in this case at the time these offenses occurred was five years old.  Her name is [AH].  She was five years old in October of 1997 when she disclosed to her mother [] that her step-father, Richard Mendoza had taken a hand held massager and had rubbed it on her vagina.  This happened at least twice between a time period of August and October 8th of 1997, which was the day she told her mother October 8.

Detective Ron Carter of the Metro Police Department was assigned to the case.  He met with Mrs. Mendoza and [AH].  He went to the home and collected the massager that was used.  That would have been introduced as evidence in this case.  Detective Carter also confronted the defendant about this.  He advised him of his *Miranda* rights.  The defendant signed a *Miranda* rights waiver form[,] and he denied initially any sexual contact with [AH].  He was arrested on that date.

On October the 10th, a few days later, the defendant was in jail.  He told the sheriff's deputy Jeff Williams that he wanted to talk to Detective Carter again.  Deputy Williams contacted Detective Carter.  Detective Carter went to the jail, had Mr. Mendoza sign another rights waiver form and after doing that, Mr. Mendoza admitted that he had not told the truth to Detective Carter a couple of days earlier when Detective Carter interviewed him.  He admitted kissing [AH]'s vagina.  He admitted putting his finger inside her vagina[,] and he also admitted using the massager on her vaginal area as well.

Based on these facts, the State would recommend a disposition of twelve and a half years on counts five and six aggravated sexual battery.  Mr. Mendoza is pleading out of range.  He has one prior felony conviction, but he's waiving that and pleading out of range.  These sentences are to run consecutively to each other for a total sentence of 25 years.  [AH]'s mother, [] [,] is in the courtroom today[,] and she approves of the settlement.

After the trial judge found the petitioner guilty and imposed sentence, the petitioner solicited permission to make a statement, which was granted.  The petitioner then apologized, "I was wrong.  Words are not ever going to be enough.  I'm sorry, and I realize it's just not enough, but I need to say, I'm deeply sorry."

-2-

Three hundred sixty-four days later, the petitioner sought post-conviction relief to set aside his guilty pleas. When his petition was denied, this appeal ensued. At the outset, we note that our review has been greatly facilitated by the post-conviction court's comprehensive written findings and conclusions and by the parties' thoughtful presentations and thorough analyses.

## I. Grounds for Relief

The record in this case reveals that the initial petition for post-conviction relief was filed *pro se*. Counsel was appointed to represent the petitioner; thereafter, two amendments to the petition were filed. From the numerous allegations appearing in the petitions, two basic themes emerge. First, the petitioner complains that his appointed trial counsel provided constitutionally ineffective representation. Second, the petitioner argues that his guilty pleas were involuntary and must be set aside. The petitioner presses these claims on appeal, and additionally he maintains that the post-conviction court erred when it overruled his request for expert services.

### A. Ineffective Assistance of Counsel

According to the petitioner, his appointed trial counsel was ineffective in the following respects:

(1) During the nineteen-month period between the petitioner's arrest (October 9, 1997) and guilty pleas (May 3, 1999), trial counsel made no attempt to interview any witnesses, most notably the victim, the victim's mother, and the detective to whom the petitioner confessed.

(2) Trial counsel waived a preliminary hearing, thereby forgoing the right to question the lead investigator and the victim, in exchange for a copy of the petitioner's taped confession but then failed to listen to the tapes for seven months, at which time the state's Rule 16 discovery obligations would have required production of the tapes.

(3) Had trial counsel investigated the petitioner's allegations of the victim's prior sexual abuse by her biological father, trial counsel could have discovered and obtained an affidavit filed in an Idaho divorce proceeding by the victim's mother that accused the father of sexually abusing the victim.

(4) Had trial counsel investigated the divorce proceedings that the petitioner's wife instituted in Nashville after the petitioner was arrested, trial counsel would have discovered that the wife did not mention the victim's sexual abuse as a ground for divorce.

(5) Trial counsel failed to move to suppress and/or challenge the petitioner's inculpatory statements to Detective Carter in a timely fashion and waited until the eve of trial, after the motion deadline had long passed, to solicit funding for expert psychological services, which request was denied by the trial court as untimely.

(6)  Trial counsel failed to take appropriate action to have the petitioner's eligible felony conviction in Idaho reduced to a misdemeanor to avoid its impeachment use if the petitioner elected to testify at trial and to blunt its impact on sentencing in the event of a conviction.

(7)  Trial counsel coerced the petitioner into accepting the state's plea offer by characterizing it as a "miracle" and an "answer" to his prayers.

(8)  Trial counsel incorrectly advised the petitioner about the admissibility of his prior conviction and about the prison availability of sex-offender treatment.

Petitioner insists that he would not have pleaded guilty to the aggravated sexual battery charges but for his counsel's failure to adequately defend his case, investigate the facts, and present appropriate defenses on his behalf.

## B.  Involuntary Guilty Pleas

The petitioner's claim of ineffective assistance of counsel dovetails, in large measure, with his contention that his guilty pleas were involuntary.  In this regard, he claims that he entered his guilty plea due to counsel's unpreparedness, and he again points to the failure to address or challenge his inculpatory statements.

## II.  Post-Conviction Evidentiary Hearing

Because of scheduling considerations, the hearing on the post-conviction petition was conducted in three stages.  In support of his claims, the petitioner first offered the testimony of clinical psychologist Joan Schleicher on the issue of reliability and/or voluntariness of confessions.  The petitioner's trial counsel had contacted Dr. Schleicher shortly before the trial date to arrange for an evaluation regarding a possible diminished capacity defense and about the petitioner's state of mind when he confessed.  The evaluation was never performed, however, because trial counsel's request for funds to hire Dr. Schleicher was denied as untimely.  Post-conviction counsel, likewise, sought funding to hire Dr. Schleicher to better challenge the constitutional voluntariness of the petitioner's confession in the post-conviction proceeding.  That request was also denied, but the basis for the ruling was the failure to make the requisite showing to obtain expert funds.

Evidently, post-conviction counsel prevailed upon Dr. Schleicher to assist without remuneration.  Although she had not spoken to or personally evaluated the petitioner, Dr. Schleicher did review materials that post-conviction counsel provided to her, including mental health and treatment records related to a prior sex offense conviction.  Based on that review, Dr. Schleicher opined that the Stockholm Syndrome "could explain why [the petitioner] called [Detective] Ron Carter and then waived his Miranda right that second time."  Without belaboring the topic, we glean from Dr. Schleicher's testimony that the syndrome is behavioral change brought on by "extreme duress."  Typically, the extreme duress involves a captive situation whereby an individual is isolated,

unable to escape, and threatened but also is shown token acts of kindness. Individuals who experience the syndrome come to identify with and seek approval from their captors.

Doctor Schleicher's opinion never solidified beyond the possibility that the Stockholm Syndrome prompted the petitioner to confess to gain approval from Detective Carter. Doctor Schleicher conceded on cross-examination that it was also possible that the petitioner felt remorse and wanted to speak with the detective or that he confessed to spare his stepdaughter from going through a trial.

The petitioner also testified and first provided background personal information. He was born in 1962 in Spokane, Washington. His musical talents were such that he was playing the guitar professionally by the time he was thirteen years old, but early in his career his life became punctuated by drug and alcohol abuse. The petitioner has four children, two daughters by his first wife and two sons by his second wife.

The petitioner testified that in 1991 he was prosecuted in Idaho for sexually molesting one of his daughters and was found guilty of lewd conduct. The petitioner was eligible for and was sentenced to a boot-camp program with substance abuse and sex offender treatment. After he completed the boot-camp sentence, the petitioner remained in treatment until he completed probation in 1996. Petitioner said that he was led to believe that if he successfully completed probation and treatment, his conviction would be "automatically dropped to a misdemeanor." As it turned out, his belief was erroneous, and, as post-conviction counsel discovered, additional legal proceedings were required to effectuate the reclassification of the conviction.

While on probation, the petitioner met and married his third wife, Melinda, whose daughter, AH, is the victim of the sexual abuse in this case. According to the petitioner's testimony, before he and Melinda could begin dating, she had to meet with his therapist and probation officer. The therapist and probation officer counseled the petitioner and Melinda on appropriate behavior, which included not allowing the petitioner to be alone with AH.

The petitioner and Melinda married in 1995. Melinda and her former husband had joint custody of AH, but they argued constantly. The petitioner testified about a court hearing in Idaho involving Melinda's concern that her former husband had been molesting AH. The petitioner stated that the litigation became too expensive for both Melinda and her former husband, and the parties eventually agreed privately to split their time with AH.

Approximately two months after the petitioner completed his probation, he relapsed into cocaine use and amassed considerable debt. The petitioner testified that he decided to promote his musical career by moving to Nashville. Melinda insisted on moving with him, and they relocated to Nashville in April 1997. None of the children moved with them at the time. In August, however, the couple returned briefly to Idaho to pick up furniture and an automobile that had been left behind in April. At that time, Melinda decided to take AH back with them to Nashville; the petitioner unsuccessfully objected to relocating the victim.

AH's presence soon caused marital tensions. The petitioner testified that he was working "doubles" at Logan's Roadhouse from 11:00 a.m. until midnight. Melinda had been accepted into a real estate training program focused on vacation time-share properties. To accommodate her training, she insisted that the petitioner assume primary responsibility for AH's care. The petitioner said that he pressed Melinda to find a substitute day-care provider but that she objected that she could not afford the expense. The petitioner related that he "juggled" his schedule at Logan's Roadhouse three times, and on the third occasion he was fired.

According to the petitioner, the morning of October 8, Melinda asked him to move out of the apartment. She repeated the request in the afternoon after AH came home from school. The petitioner insisted that he lacked the financial resources to move. That evening, Melinda took AH with her to work. Around 6:00 p.m., the petitioner received a curious telephone call from a woman who explained that Melinda had hired her as a sitter for AH. As the evening wore on and the petitioner did not hear from his wife, he called her at work. She told him that she had tried removing his name from the apartment lease. Wanting to confront his wife in person, the petitioner drove to her office where he encountered his wife and his wife's boss, with whom the petitioner suspected his wife was having an affair.

A police officer came into the room and instructed the petitioner to wait outside. While the petitioner waited, Detective Ron Carter approached the petitioner, escorted him to an unmarked vehicle, and questioned whether he had abused AH. The petitioner denied any such activity, but he provided Detective Carter with information about his prior conviction. The petitioner testified that he was very upset.

The petitioner related that later that evening he was arrested. Detective Carter gave the petitioner a business card and told the petitioner to call as soon as possible. The petitioner said that he "figured that somehow maybe if I called [Carter], he would somehow let me out." The petitioner was unable to make bond, and he testified that his treatment at the jail upset him further and made him fearful for his safety. The petitioner claimed that after he was fingerprinted, he heard someone yelling out for the jailers "to make sure he went in population and got his beating." The petitioner said that he had heard that a person accused of a sex charge would be raped and killed in prison. Other officers, according to the petitioner, questioned him why he had raped the victim, and one officer showed the petitioner a newspaper article reporting on the petitioner's arrest and the outstanding charges. The petitioner claimed that the officer with the newspaper told him that everyone in the jail was going to find out about him.

There was something about the newspaper article that agitated the petitioner. At the post-conviction hearing, his testimony on this point was vague. He said that he wanted to know why Detective Carter had lied about him to the newspaper. The petitioner expressed his desire to speak with Detective Carter, and his request was relayed to the detective. As a result, Detective Carter came to the jail and met with the petitioner on the evening of October 10, 1997. Detective Carter advised the petitioner of his rights, obtained a signed rights waiver from the petitioner, and tape recorded the ensuing conversation.

Contrary to his earlier denials of guilt, the petitioner made numerous inculpatory statements to Detective Carter on that occasion. Included in the record before us are audio cassette tape recordings of the petitioner's October 10 statements to Detective Carter and transcripts of the cassette tape recordings, prepared by the petitioner's post-conviction counsel. We have reviewed these materials and find the following excerpts to be representative of the petitioner's admissions of wrongdoing.

> [Detective Carter]: . . . [O]ne of the things she had said that you had taken your tongue and was doing oral sex with her – putting your tongue in her vaginal area.
>
> [Mendoza]: I wasn't putting my tongue there. I kissed her, but I didn't stick my tongue in her. . . . But I did kiss her there. . . . I tried to pretend it wasn't anything serious – that I wasn't doing anything wrong. . . .
>
> . . . .
>
> [Detective Carter]: At what point did you start feeling yourself slip back into wanting to molest a child? And that's exactly what you did.
>
> [Mendoza]: [AH's father] had told [AH] – this is over the phone before she came – that she couldn't wear underwear to bed. And she told Melinda this. And in my head – I knew that he was grooming her. And in my head I actually started grooming her, thinking she was going to be not wearing underwear and she's going to want this.
>
> . . . .
>
> [Detective Carter]: How many times have you touched her?
>
> [Mendoza]: Total of four (4). And each time I swore I'd never do it again. And I told her that I can't and that it was wrong.
>
> . . . .
>
> [Detective Carter]: How many times did you lick her?
>
> [Mendoza]: Twice.
>
> . . . .

[Mendoza]: . . . I gave myself permission because [AH's father] did and so I figured well if [AH] wanted [her father] to, then it was okay for me. When I should have just said no, don't, it was wrong. Then when she told me that – that he had did that – and I knew that. And I should have stopped it then, but I didn't. And I can't – I can't make any excuses. It's my fault and it is my sickness. . . .

At the post-conviction hearing, the petitioner attempted to explain why he made the inculpatory statements to the detective. The petitioner variously pointed to sleep deprivation, not being in his "right mind," being confused and trying to think of anything to say to "appease" Detective Carter, and thinking that his statements would get him out of jail. Regarding why he ultimately agreed to plead guilty, the petitioner testified inter alia, that his trial counsel told him that there was no defense he could raise in light of the inculpatory taped statements. He said that he "was defenseless, and going to trial would be ridiculous." The petitioner mentioned that after being incarcerated for nineteen months, his mental health was poor and that he was sick of the death threats and persecution from other inmates and guards. In addition, he was fearful that if he went to trial, the state would use his past sex abuse therapy and history of being a child molester against him. While incarcerated, the petitioner had a religious experience. He testified that an important consideration that got him to sign the plea agreement was that when his attorney presented it to him, the attorney told him that "it was a miracle from God, a gift from God, that that was [his] answer to prayer."

The state called the petitioner's appointed trial counsel, Jerrilyn Manning, to testify at the post-conviction hearing. She explained that she was originally assigned to the case and later recruited another attorney from her office to assist so the petitioner would have a second attorney with whom to consult. Ms. Manning admitted that she waived the preliminary hearing on the petitioner's charges. She also conceded that the defense gained no tactical advantage from the waiver because, although the waiver was predicated on the state's early production of the petitioner's taped statements, she did not listen to the tapes until May 1998 – after the petitioner was indicted.

Ms. Manning, likewise, did not dispute that she interviewed no witnesses. She testified that she did not interview Detective Carter because she had the tape recorded statements. She did not attempt to interview the victim or the victim's mother because she did not know how to locate them. Ms. Manning explained that in her experience, the state would not have made the child available to be interviewed and that the mother would have rebuffed a request through the state for an interview. Thus, she did not pursue a request through the state that she be allowed to speak to these witnesses.

Ms. Manning was shown records obtained by post-conviction counsel from Idaho and Washington, which included police reports regarding allegations that the victim had been sexually abused by her father and divorce records containing sworn accusations by the victim's mother that her former husband had molested the child. Ms. Manning acknowledged that the petitioner had

asked her to investigate the allegations but that all she did was send a request to the state for exculpatory evidence of other sex abuse allegations involving the victim.

Ms. Manning defended her inactivity, by and large, on the basis that from her first meeting with the petitioner until December 1998, he insisted that he did not want to go to trial. She related that the petitioner told her that he confessed to the detective because he "wanted to clear everything up." The petitioner, however, insisted to Ms. Manning that he never raped AH. He told his attorney that "he had not penetrated her, but that he had kissed her in her vaginal area and had touched her with a massager in her vaginal area."

At one point in March 1998, the state made a 30-year plea offer on the case. Because of the petitioner's insistence that he was not guilty of rape, Ms. Manning solicited the state to allow the petitioner to plead to aggravated sexual battery. The state's response was an immediate and unequivocal "no." Ms. Manning testified that she explained to the petitioner the legal definition of "penetration" and that she even reviewed with the petitioner copies of relevant cases addressing the issue. In her opinion and based on the petitioner's admissions, a jury instruction on penetration would have been forthcoming in the event the case was tried.

According to Ms. Manning, in early December 1998, the petitioner then did an about-face; he took the position that nothing happened and that AH made up the allegations against him because of her father. In terms of trial strategy, Ms. Manning testified that she told the petitioner that juries often find children to be persuasive and that the biggest problem with his case was his confession to Detective Carter and how to challenge it. She admitted telling the petitioner that his prior sex conviction could be used against him, but she said that the discussion related mainly to use of the conviction at sentencing should he be convicted. As for the conviction being disallowed if the petitioner did not testify at trial, Ms. Manning said that he intended to testify. As for impeachment use of the conviction depending on its felony/misdemeanor status, she did not recall discussing the distinction with the petitioner. She said that the petitioner was of the opinion that the conviction already had been reduced to a misdemeanor.

Nothing was filed relative to the petitioner's confession until late April of 1999. At that time, petitioner's counsel filed a motion to suppress the statements made to Detective Carter and a motion seeking funds to hire a psychological expert to assist in challenging the admissibility of the statements. The petitioner's charges were set for trial on May 10, 1999. On April 30, 1999, the conviction court entered an order denying the request for funding. "The motion for an expert," the court wrote, "is untimely." The court continued, "The record supports no reason that it is filed a year after the motion filing deadline and a week and a half before trial." The motion to suppress was scheduled for hearing on May 3, 1999, but it was preempted by the petitioner's guilty pleas on that date.

Ms. Manning was questioned at the post-conviction hearing about the five-month delay from December of 1998 until April 1999 in requesting funds and challenging the statements. She cited nonspecific problems related to the two previous trial settings in the case and explained

that because of a death in her family, she had taken time off to be with her family. Also, Ms. Manning and co-counsel were having difficulties in identifying any legal irregularities in how the petitioner's statement was taken.

The plea offer that the petitioner accepted was made after the funding request was denied but while the suppression motion was outstanding. Ms. Manning testified that she could not recall the specifics of the conversation with the petitioner, but she remembered that God was mentioned and that the petitioner remarked that he had prayed about the matter. Ms. Manning denied telling the petitioner that the plea offer was a "gift" from God, but she conceded, "I told him perhaps this was the answer to his prayers."

At the time the petitioner agreed to accept the offer, he had been incarcerated for about nineteen months. Ms. Manning described his demeanor in terms of "he considered himself in pretty much a lose/lose situation from the beginning." The petitioner was satisfied, however, with the offer because he would not be pleading guilty to penetrating the victim.

The final post-conviction witness was Detective Carter. His testimony was brief. He related the circumstances under which he talked to the petitioner. He affirmed that on both occasions when he spoke with the petitioner that he advised the petitioner of his rights and obtained a signed rights waiver. Detective Carter said that the petitioner did not mention that anyone at the jail had threatened him. Regarding the victim's allegations, Detective Carter testified that the victim was claiming that the petitioner was the only person who had abused her; the petitioner, however, told the detective that something had occurred between the victim and her father.

### III. Post-Conviction Court's Memorandum and Order

At the close of the evidentiary hearing, the court took the matter under advisement, and on June 21, 2001, it issued its ruling denying the petition for post-conviction relief. The court began by pointing out that it would have been difficult for the petitioner to have prevailed in a jury trial if his confession to Detective Carter had been admitted and the five-year-old victim had testified. The court credited the testimony of trial counsel that the petitioner initially indicated that he did not want to go to trial and that the petitioner admitted his guilt to trial counsel. After being in custody for slightly more than a year, the petitioner then changed his mind. The court accepted Ms. Manning's testimony that, despite her efforts to explain the law, the petitioner insisted that he had not penetrated the victim and, therefore, was not guilty of rape. On the day he pleaded guilty, the petitioner sought permission to make a statement, which was granted. The petitioner apologized to his wife, who was in the courtroom that day, professed his love, and asked for forgiveness.

The post-conviction court then proceeded to address each criticism that the petitioner had leveled against trial counsel. We summarize the court's findings and conclusions.

As for the failure to interview witnesses, the court found that the petitioner had failed to show prejudice. The court noted that trial counsel did not know how to locate the victim or the

victim's mother, and trial counsel believed that any interview request through the state would have been refused.

As for the waiver of the preliminary hearing, the court found "no breach of the standard expected of competent counsel and no prejudice." The court relied on the absence of proof how the hearing would have benefitted the petitioner and on trial counsel's remembrance that the petitioner did not want the victim to have to testify at the hearing.

Regarding trial counsel's failure to pursue the allegations that the victim had been abused by her father, the court was not impressed with the value of the information. The court did state that trial counsel should have investigated the allegations and obtained the affidavit filed by the victim's mother in the Idaho divorce case. Nevertheless, trial counsel's failure did not, in the court's opinion, prejudice the petitioner. The victim, for example, had no physical signs of sexual abuse; the petitioner, therefore, did not need to blame anyone else for injuring the victim. In addition, in the court's estimation, impeaching a five-year-old child with a prior inconsistency carries "some weight but not great weight."

The Nashville divorce records, showing that the petitioner's wife did not claim sex abuse as a ground of divorce from the petitioner, might have been admissible at trial, according to the post-conviction court. Its impeachment value in cross-examination of the petitioner's wife would have, however, been slight.

Concerning the petitioner's confession, the post-conviction court found no basis upon which trial counsel could have effectively challenged its admission or impeached its reliability. The court found that the petitioner's rights were meticulously observed by Detective Carter and that the rights waivers were validly obtained. Having listened to the petitioner's testimony and having observed his demeanor, the post-conviction court described him as an "intelligent and articulate individual."

The court was skeptical that the petitioner's confession was motivated by a desire to please Detective Carter or by threats and harassment by other prisoners and correction officers. Rather, the court concluded that the petitioner was motivated by remorse and concern for the victim. Moreover, even if the petitioner thought that his confession might improve his jail situation or somehow result in his release, the court found that such "unrealistic" beliefs did not render his confession involuntary.

In a similar fashion, the court was doubtful that a psychologist could have helped the petitioner either suppress the confession or explain to the jury why he might have falsely confessed. The court declined to wade into the intricacies of the "Stockholm Syndrome" or whether a person suffering from the syndrome lacks "free will." The testimony of Dr. Schleicher, taken in its best light, was that the petitioner was motivated to please Detective Carter, which might have caused him to confess falsely. The court disposed of this possibility, finding that "any possible use of the 'Stockholm Syndrome' at trial in an effort to impeach the confession is simply not credible."

-11-

Turning to the petitioner's prior Idaho conviction, the post-conviction court accepted the petitioner's evidence that the felony conviction could have been reduced to a misdemeanor. The petitioner, though, advised trial counsel that the conviction already had been reduced to a misdemeanor. Trial counsel took the incorrect information and advised the petitioner that the conviction could have an adverse impact on sentencing and that the state might attempt to use the conviction for impeachment should he testify at trial. "There is certainly no prejudice," the post-conviction court concluded, "from the way this was handled, although it certainly would have been better if trial counsel had known that conviction had not been reduced to a misdemeanor."

Last, the post-conviction court simply did not credit the petitioner's testimony that trial counsel told him that the plea offer was a "gift from God" or that trial counsel pressured him to enter a plea. The court found that trial counsel's statement that perhaps the offer was an answer to the petitioner's prayers was a passing comment and did not exert any pressure on the petitioner to plead.

The post-conviction court summed up its findings and conclusions on the ineffective assistance of counsel claims by expressing the opinion that while trial counsel "could have done several things better," the overall quality of representation "had no impact" on the petitioner's guilty pleas. From the evidence presented, the court was convinced that even if trial counsel had done everything about which the petitioner complained, he still would have pleaded guilty.

The post-conviction court briefly discussed the involuntary guilty plea argument. The court cited to the absence of credible evidence to support the involuntary nature of the plea. The court pointed out that the petitioner had several days to consider the plea and that during the plea colloquy, he responded "rationally and appropriately to all the questions asked." Moreover, the petitioner apologized in open court for abusing his stepdaughter.

Accordingly, the post-conviction court denied the petition.

## IV. Denial of Expert Services for Post-conviction Proceedings

On appeal, the petitioner registers an initial complaint that the post-conviction court erred in denying his request for funds for expert psychological services at the post-conviction level. As we indicated earlier, the petitioner sought funds to retain Dr. Joan Schleicher to demonstrate how the voluntariness and reliability of his confession to Detective Carter could have been contested during the original prosecution. Doctor Schleicher is the same expert for whom the petitioner's trial counsel had unsuccessfully solicited funding on the eve of trial. The petitioner insists that Dr. Schleicher's testimony and her written report met the threshold requirement of showing a particularized need for expert services.

The petitioner's argument is somewhat misleading because at the motion hearing on the request for expert funds, the petitioner did not present Dr. Schleicher's testimony or introduce her written report. Her testimony and report were offered at a later time when the merits of the post-

conviction claims were litigated. At the motion hearing, post-conviction counsel simply argued in support of the motion. Essentially, the argument was that in the typical situation, it is illogical, or at least unusual, for an arrestee to ask to speak to a law enforcement officer; ergo, serious questions about the petitioner's mental health must exist requiring expert assistance. When the post-conviction court expressed skepticism about the speculative nature of the claim, the petitioner's counsel then argued, "[L]et's pretend that this is not a post conviction proceeding. Let's do what due process requires and put us back at the trial. . . . I should not have to jump over some huge due process hurdle." The post-conviction court remained unconvinced and denied the motion. We review that ruling for an abuse of discretion. *See State v. Scott*, 33 S.W.3d 746, 752 (Tenn. 2000).

On appeal, the petitioner points to Tennessee Supreme Court Rule 13, *State v. Barnett*, 909 S.W.2d 423 (Tenn. 1995), *State v. Scott*, 33 S.W.3d 746 (Tenn. 2000), and *State v. Georgia Lucinda Hagerty*, No. E2001-01254-CCA-R10-CD (Tenn. Crim. App., Knoxville., April 23, 2002), as supporting his post-conviction funding request. We disagree. First of all, the showing of "particularized need" for expert services means just that; the need must be "particularized." *Barnett*, 909 S.W.2d at 431. Each request, consequently, stands or falls on the facts and circumstances of the particular case. *Id*. The required showing was not made in this case.

In *Georgia Lucinda Hagerty*, for example, the court recounted in painstaking detail how the defense made out its case of "particularized need" for expert assistance regarding posttraumatic stress disorder. The defense offered live testimony and affidavits from fact witnesses to the abuse inflicted on defendant Hagerty by the deceased victim. *Id*., slip op. at 7-8. The defense established that there was "legitimate psychiatric recognition of posttraumatic stress disorder in the domestic abuse or battering context," and the defense showed a connection between the facts and circumstances of the case and the disorder. *Id*., slip op. at 9. The court described the defense burden as presenting a "daunting challenge of demonstrating, by reference to specific facts and circumstances, that expert assistance is necessary to ensure – not a perfect – but a fundamentally fair trial." *Id*., slip op. at 6-7. In our estimation, the petitioner in this case failed to launch an effective campaign to meet the "daunting challenge."

Similarly, in *Scott*, the defense went to great lengths to show particularized need for a DNA analysis expert. The defendant, according to the *Scott* court, "listed in meticulous detail the reasons needed for the expert assistance" and offered supporting witnesses. *Scott*, 33 S.W.3d at 753. Among the reasons developed were the need to educate defense counsel about relevant issues involved in DNA analysis, the need to determine if DNA samples had been contaminated in light of inconsistent results reached by different examiners, and the need to understand why some reports mentioned that blood samples from the defendant's clothing contained the DNA of an unidentified third person. *Id*. at 753-54. Under those circumstances, the supreme court held that the trial court erred in denying the requested services. *See id*. at 754 ("the trial court deprived the [defendant] of a meaningful opportunity to defend when his liberty was at stake").

The particularized need showings in *Scott and Hagerty* are qualitatively different from the petitioner's assertions in this case. Rather than supporting the petitioner's position, these cases highlight the deficiencies in the petitioner's application for expert assistance.

Furthermore – and perhaps more fundamentally – notwithstanding the petitioner's protestations, his request for funding must be viewed through the lens of a non-capital, collateral attack on his guilty pleas. Section 5(a) of Tennessee Supreme Court Rule 13 gives discretion to a trial court to authorize expert services only in "the trial and direct appeals of all criminal cases in which the defendant is entitled to appointed counsel and in the trial and appeals of post-conviction proceedings in capital cases." Tenn. R. S. Ct. 13, § 5(a). In addition, via *Davis v. State*, 912 S.W.2d 689, 696-97 (Tenn. 1995), the supreme court has reiterated that "the state is not required to provide expert assistance to indigent non-capital post-conviction petitioners." The court explained, "Once the process goes beyond the trial and direct appeal as of right stage, the state has no duty to duplicate the legal arsenal that may be privately retained by a criminal defendant in a continuing effort to reverse his conviction." *Id*. at 696; *see Clayton Eugene Turner v. State*, No. E2001-02476-CCA-R3-PC, slip op. at 7 (Tenn. Crim. App., Knoxville, Oct. 1, 2002); *John Paul Seals v. State*, No. E2001-01756-CCA-R3-PC, slip op. at 3-4 (Tenn. Crim. App., Knoxville, July 11, 2002), *perm. app. denied* (Tenn. 2002); *Antione Harbison v. State*, No. M2001-00887-CCA-R3-CD, slip op. at 12-13 (Tenn. Crim. App., Nashville, April 10, 2002), *perm. app. denied* (Tenn. 2002).

Consequently, for all the foregoing reasons, the post-conviction court cannot be faulted or put in error for denying the petitioner's request for expert assistance.

## V. Standard of Review: Ineffective Assistance of Counsel & Involuntary Guilty Plea

A post-conviction petitioner bears the burden of proving his or her allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (1997). "Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). On appeal, the appellate court accords to the trial court's findings of fact the weight of a jury verdict, and those findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-89 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). Conclusions of law receive purely *de novo* review, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001).

The Sixth Amendment to the United States Constitution and Article I, section 9 of the Tennessee Constitution both provide that a defendant in a criminal case is entitled to effective assistance of counsel. *See Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975). To make out a claim of ineffective assistance of counsel, the petitioner must show both that his counsel failed to perform at a level demanded of attorneys in criminal cases and that the deficient performance adversely affected the defense. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067 (1984); *Baxter*, 523 S.W.2d at 936**.** Should the petitioner fail to establish *either* deficient performance *or* resulting

prejudice, he is not entitled to relief. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069. On appeal, there is a strong presumption that the petitioner received satisfactory representation. *Barr v. State*, 910 S.W.2d 462, 464 (Tenn. Crim. App. 1995).

When reviewing an attorney's performance, courts do not "'second guess' tactical and strategic choices," nor do we "measure [the] defense attorney's representation by '20-20 hindsight.'" *Henley*, 960 S.W.2d at 579. We endeavor to eliminate "the distorting effects of hindsight . . . [and] evaluate the conduct from counsel's perspective at the time" of the conduct. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996). Simply stated, on appeal, there is a strong presumption that the petitioner received satisfactory representation. *Barr*, 910 S.W.2d at 464. On the other hand, our "deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *Goad*, 938 S.W.2d at 369.

When the petitioner claims that ineffective assistance of counsel resulted in a guilty plea, the petitioner must show a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *Hill v. Lockhart*, 474 U.S. 52, 58-59, 106 S. Ct. 366, 350 (1985). Independent of, and as an alternative to, the claim of ineffective assistance of counsel, a post-conviction petitioner may successfully attack his conviction when his guilty plea was unknowing or involuntary. *See* Tenn. Code Ann. § 40-30-203 (1997) (post-conviction relief available "when the conviction is void or voidable because of the abridgement" of a constitutional right); *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S. Ct. 1709, 1712 (1969); *State v. Wilson*, 31 S.W.3d 189, 194 (Tenn. 2002) (due process requires that guilty pleas be knowing and voluntary). The petitioner has advanced both types of claims.

## VI. Ineffective Assistance of Counsel

The record before us, and particularly the testimony of petitioner's trial counsel, is convincing that the investigative efforts were quite meager. Trial counsel interviewed no witnesses, failed to investigate allegations of prior sexual abuse by the victim's father, failed to explore possible motives of the petitioner's wife to make untruthful allegations, and failed to verify or check on the petitioner's prior criminal history. Evidently, the confession to Detective Carter, in conjunction with the petitioner's inculpatory admissions to his counsel, were the driving forces that caused trial counsel to abandon independent avenues of investigation.

In general, an attorney has a duty to conduct an appropriate investigation into both the facts and the law to examine possible areas of defense. *See Baxter*, 523 S.W.2d at 932. Our adversarial system of justice, at the most fundamental level, functions only when "'all available defenses are raised' so that the government is put to its proof." *Id.* at 932-33 (quoting *United States v. Decoster*, 487 F.2d 1197, 1203-04 (D.C. Cir. 1973)).

"Reasonableness," however, is the constant guidepost to arrive at a fair assessment of attorney performance. In the context of investigation options, the *Strickland* Court explained,

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitation on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgment.

*Strickland*, 466 U.S. at 690-91, 104 S. Ct. at 2066.

The *Strickland* Court elaborated further about the reasonableness of counsel's choices in response to a client's own statements or actions.

> The reasonableness of counsel's action may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Id*. at 691, 104 S. Ct. at 2066.

In this case, based on the petitioner's confession to law enforcement and on his insistence that he was not guilty of "rape" because he never penetrated AH, certain areas of investigation reasonably could have been assigned a low priority. What strikes us as disturbing, however, in this case relative to the *Strickland* performance component is that trial counsel's

decisions appear largely, if not wholly, influenced by certain "assumptions." She assumed, for instance, that the state would not have made AH available for an interview; she assumed that the victim's mother would have declined an interview request communicated through the state; she assumed that Detective Carter had no relevant information to convey. In addition, she evidently assumed that the petitioner's taped statements to Detective Carter were so devastating that no urgent need existed to listen to the tapes.

Cookie-cutter advocacy is fraught with peril. If, for example, through efforts to interview AH and the mother, trial counsel had discovered that AH was refusing to testify, the strength of the state's case could have been affected. It is well-settled law that a conviction cannot be founded solely upon a defendant's confession; corroborating evidence is required to sustain the conviction. *See State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000). By these observations, we are not suggesting that a client's inculpatory statements should be irrelevant to formulating a plan of investigation. Nor, however, do we believe that a confession invariably vitiates the need for any investigation. *See Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002) (stating that "a defendant's statements or confessions do not eliminate counsel's duty to investigate").

We are confronted in this case with trial counsel's failure to explore in a timely or meaningful fashion the viability of defense strategies. Moreover, we are not speaking of some elaborate or innovative exploration. We are referring to bedrock investigative techniques, such as attempting to interview fact witnesses and evaluating the state's ability to prove each and every element of the charged crimes beyond a reasonable doubt.

By contrast, the claim that trial counsel's services were substandard in failing to develop a psychological construct to challenge the petitioner's confession as involuntary or unreliable is much weaker. The record is devoid of any evidence of procedural irregularities, such as *Miranda* violations, in how Detective Carter obtained the inculpatory admissions from the petitioner. The petitioner told trial counsel that he confessed because he "wanted to clear everything up." We discern that trial counsel considered the petitioner to be a rather "difficult" and emotional client, but the difficulties appear to stem largely from the petitioner's inability to understand or unwillingness to accept the legal definition of "sexual penetration" as an element of rape. Although his incarceration undoubtedly was unpleasant and stressful, the petitioner presented no symptoms of intellectual deficiency or other condition that would prompt a false confession. *See generally Nichols*, 90 S.W.3d at 590-97 (petitioner mounted extensive, but unsuccessful, campaign to prove his confessions should have been challenged by counsel as false because they contained inaccuracies and omissions and because there was evidence of innocence).

Trial counsel's performance vis-a-vis the petitioner's confession likewise appears reasonable pursuant to existing legal authority. In *Brimmer v. State*, 29 S.W.3d 497 (Tenn. Crim. App. 1998), which was decided prior to the petitioner's guilty pleas, Brimmer complained that trial counsel was ineffective for failing to present expert testimony at a suppression hearing about "Prisoner of War Syndrome" whereby "sensory deprivation occurring in solitary confinement might

-17-

result in a false statement by the prisoner in order to please his captors." *Id.* at 511. The court concluded that even had such testimony been offered, no legal basis for suppression existed.

> In *Colorado v. Connelly*, 479 U.S. 157, 164, 107 S. Ct. 515, 93 L.Ed.2d 473 (1986), the United States Supreme Court ruled that "a defendant's mental condition, by itself and apart from its relation to official coercion" does not render a statement involuntary. Because the rule of exclusion has been established as a deterrent to police misconduct, coercive activity on the part of law enforcement is a necessary predicate to finding that a confession is not voluntary under the Due Process Clause.

*Brimmer*, 29 S.W.3d at 512.

Previously on appeal to the supreme court, Brimmer had complained that the trial court erroneously excluded the same expert testimony during the guilt phase of the defendant's trial. *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994). The trial court found that the basis for the expert's opinion "was not sufficiently trustworthy to go to the jury on the issue as to who and what may have influenced the defendant's mental state at the time that he gave his confession." *Id.* Also, the trial court noted that the defendant was not otherwise prevented from showing the jury the physical and psychological environment that yielded his confession. *See id.* The supreme court found no error in disallowing the testimony at trial. *See id.*

In summary, the petitioner's complaints about trial counsel's deficient performance are legitimate, in part, and unfounded in other respects. Turning next to the prejudice component of the ineffective assistance claim, our review of the record convinces us that the lower court correctly gauged the petitioner's failure to show that he would have insisted on going to trial but for trial counsel's lapses in performance.

When, as in this case, a claim of ineffective assistance of counsel is predicated on a failure to investigate, the petitioner is obligated to show what a reasonable investigation would have revealed. *See Owens v. State*, 13 S.W.3d 742, 756 (Tenn. Crim. App. 1999) ("deficient representation by omission requires more than a speculative showing of a lost potential benefit"). The petitioner failed to make the requisite showing in connection with his complaints that trial counsel did not interview witnesses and waived a preliminary hearing. The petitioner was unable to locate AH or AH's mother and, therefore, did not present their testimony at the hearing on his post-conviction petition. *See Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990) (even if petitioner can show deficient performance by counsel, petitioner not entitled to relief unless he produces witness at post-conviction hearing, shows that counsel could have located witness, and elicits both favorable and material testimony from witness). Likewise, the petitioner submitted no evidence indicating how he would have benefitted from a preliminary hearing. *Strickland*'s prejudice prong clearly has not been satisfied for these complaints.

As for the balance of his ineffective assistance claims, the petitioner did endeavor to introduce exhibits, testimony, and other evidence showing what a reasonable investigation would have uncovered. The petitioner did not, however, prove by clear and convincing evidence that these fruits of a constitutionally "effective" investigation would have sustained his resolve to go to trial. The post-conviction court accredited trial counsel's testimony that for approximately one year after his arrest, the petitioner said that he did not want to go to trial on the charges. In early December 1998, the petitioner, according to trial counsel, changed his mind, maintained that nothing had happened between AH and him, and claimed that AH made up the allegations against him because of her father. Most likely, trial counsel finally persuaded the petitioner that his notion of sexual penetration was not consistent with the legal definition, and the petitioner reacted by claiming that AH had fabricated the allegations against him because of her father.

Approximately five months later and on the eve of trial, the petitioner then accepted the state's plea offer to consecutive, out-of-range sentences to two counts of aggravated sexual battery. Thus, the pivotal time frame in this case is the period between December 1998 and May 3, 1999, when the petitioner pleaded guilty, and the critical inquiry is what caused the collapse of the petitioner's resolve to go to trial. The petitioner's post-conviction testimony mentions several reasons for pleading guilty. At one point, he testified that he was "not in good mental health," that he was "sick of the persecution from the other inmates and the guard," and that he "gave up." He also said that he was trying to please everyone by pleading guilty. Other reasons that he gave were that he "wanted to get out of that county jail," and that when trial counsel communicated the state's offer, he thought that she was "giving [him] the answer from God."

Notably, the petitioner's testimony does not attribute his guilty pleas to trial counsel's failure to investigate prior sexual abuse of AH, the divorce proceedings that the petitioner's wife instituted in Nashville after he was arrested, his Idaho conviction, or his treatment records related to the prior conviction. Insight regarding why the petitioner asked trial counsel to investigate these matters is found in his statement, "I wanted [trial counsel] to get all that information so that they didn't – I wanted them to understand what I'd really been trying to work for." Later, the petitioner reiterated the same point. "I guess that's why I asked her to get records from, you know, my treatment facilities; because I figured that that would be able to help her understand what I had been working in as far as treatment."

The following testimony is the most detailed account why he accepted the state's plea offer:

> And [trial counsel] came to me, I think it was on a Friday, with that plea agreement and said, You need to get out of here. . . . And – and I said, Yeah, I really do. And she goes, They've offered you this deal at eighty-five percent. Because up to that time, she had always said a hundred percent[.] There's no way you get anything less than a hundred percent. And that's – so I would never take any deal offered, and – and plus, I wanted a trial. I figured that somehow

I would have a defense because I was – I never hurt [AH], and I wanted to prove that. And I've never talked to my ex. I thought, Okay, go to trial, it will all come out. So every time she would come to me with an offer, I would say no. But that – at that time, I was so sick of everything that was happening around me, and when she said eighty-five percent, I thought, I'm going to get out somehow. I thought maybe that would be a way to make parole or somehow, you know, to get out.

In addition, the petitioner admitted in his testimony that he understood that if he went to trial and was convicted, he could be sentenced to a much longer term than the 25 years that the state was offering.

In our opinion, the petitioner was operating from an enlightened position of self interest when he decided to plead guilty. With the plea offer, the petitioner avoided pleading guilty to or being found guilty of raping AH, and he avoided a much longer term of incarceration. Even if the petitioner essentially "gave up," he did so with the knowledge that accepting the state's offer had distinct advantages to being convicted of and sentenced for raping AH. To be sure, the evidence and information uncovered and developed by post-conviction counsel could have been put to good use at a trial, but a successful collateral attack on a guilty plea must meet a more exacting standard; to obtain relief on the basis of ineffective assistance of counsel, a petitioner must demonstrate by clear and convincing evidence that but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *See Hill*, 474 U.S. at 58-59, 106 S. Ct. at 370; *Hicks*, 983 S.W.2d at 246. The petitioner has not carried his burden.

The final prejudice inquiry, upon which we will touch briefly, concerns the petitioner's complaint about trial counsel's failure to challenge his confession as involuntary or unreliable. Previously, we concluded that trial counsel's performance was not professionally unreasonable. The ineffective assistance claim fails for the additional reason that prejudice has not been demonstrated.

Even were we to assume that the petitioner would have insisted on going to trial had his confession to Detective Carter been suppressed, there are simply no demonstrable grounds upon which to order suppression. *See Brimmer v. State*, 29 S.W.3d at 514-15 (because petitioner failed to show that suppression motion would have been successful, no prejudice could have resulted from counsel's inaction). The petitioner's invocation of the "Stockholm Syndrome" does not suffice. As we previously mentioned, Dr. Schleicher never spoke to or personally evaluated the petitioner. In light of the magnitude of Dr. Schleicher's uncompensated efforts, which evidently involved review of voluminous treatment records, the preparation of a written report, and in-court testimony, we find it somewhat curious that this expert failed to or was not asked to take the logical, final step of interviewing the petitioner. Nonetheless, Dr. Schleicher's testimony, as it stands, raises only a possibility that the petitioner's motivation in confessing was to gain approval from Detective Carter. That possibility, moreover, fails to establish the requisite "coercive activity on the part of law

enforcement[, which] is a necessary predicate to finding that a confession is not voluntary under the Due Process Clause." *Id.* at 512.

As for trial counsel's failure to be prepared to use the "Stockholm Syndrome" to explore with the jury the physical and psychological environment in which the confession was given, we are not persuaded that the evidence would have been admissible. *See State v. Brimmer*, 876 S.W.2d at 79. Additionally, such evidence may have opened the door for the state to elicit the details of the petitioner's prior arrest, conviction, and treatment. The petitioner admitted in his testimony that he did not plead guilty to the earlier charge of molesting his daughter. He contested his guilt and was tried and convicted by a jury. The petitioner's earlier course of action arguably could be portrayed as inconsistent with the theory that the petitioner suffered from "Stockholm Syndrome" at the time he confessed to Detective Carter. Almost certainly, his treatment records would have been relevant.

At one point during his post-conviction testimony, the petitioner was asked if, at the time he pleaded guilty, was he thinking that his prior conviction could be used to prove his guilt of the charges involving AH. The petitioner responded that he "thought most definitely that that was going to be used against [him]." Offering "Stockholm Syndrome" testimony at trial would have practically guaranteed the independent, substantive use of the prior conviction by the state, which the petitioner was trying to avoid by pleading guilty.

Given the record before us, we affirm the post-conviction court's denial of relief based on ineffective assistance of counsel. Although trial counsel's performance was deficient in certain respects, which we have explained, the petitioner is not entitled to relief because he has failed to prove by clear and convincing evidence that he was prejudiced by such performance as required pursuant to *Strickland* and *Hill*.

## VII. Voluntariness of the Guilty Pleas

When an accused opts to plead guilty, the plea must be voluntarily, understandingly, and knowingly entered to pass constitutional muster. *See Boykin* 395 U.S. at 244, 89 S. Ct. at 1713. In Tennessee, a plea must be voluntary and entered with full understanding of its consequences. *See State v. Neil*, 810 S.W.2d 131, 134-35 (Tenn. 1991). Entry of a guilty plea constitutes a waiver of constitutional rights including the privilege against self-incrimination, the right to confront witnesses, and the right to a trial by jury. *Boykin*, 395 U.S. at 243, 89 S. Ct. at 1714. Waiver of constitutional rights may not be presumed from a silent record. *See id.*

We have carefully reviewed the record before us, which includes a transcript of the petitioner's plea submission, and we find no evidence that the petitioner was forced or coerced into pleading guilty. The post-conviction/trial court observed the petitioner's demeanor during the plea submission, and the court made specific findings relative to the post-conviction proceeding that the petitioner responded "rationally and appropriately to all the questions asked." The petitioner offered an ostensibly heart-felt apology after the court accepted his plea, found him guilty, and imposed

sentence. The post-conviction court did not accredit the petitioner's claims that trial counsel encouraged him to accept the plea offer because it was a "gift from God" or that trial counsel otherwise invoked religion to pressure the petitioner to plead guilty. Inasmuch as the evidence does not preponderate against these findings and credibility determinations, they are conclusive on appeal.

Furthermore, we note that the state effectively impeached the petitioner's on cross-examination regarding his sworn admissions, responses, and statements when he pleaded guilty, which were inconsistent with his denial of wrongdoing in connection with his post-conviction claims. In particular, when the petitioner was asked why the post-conviction court should believe that he was telling the truth, he responded, "My whole life I was conditioned to lie, from a young child."

We have no hesitation in affirming the post-conviction court's rejection of this claim for relief.

## VIII.  Conclusion

The evidence in the record before us fully supports the post-conviction court's conclusion that the petitioner is not entitled to relief. The petitioner received effective assistance of counsel, entered his guilty pleas intelligently, knowingly, and voluntarily, and was not erroneously denied expert services at the post-conviction level. We, therefore, affirm the post-conviction court's ruling.

_____
JAMES CURWOOD WITT, JR., JUDGE

-22-